## METALS DISINTEGRATING CO., Inc.
## v. REYNOLDS METALS CO.
### Civ. 1120.

United States District Court,
D. Delaware.
Aug. 28, 1952.

Arthur G. Connolly, Wilmington, Del., Paul S. Bolger and W. D. Keith (of Cooper, Byrne, Dunham, Keith & Dearborn), New York City, for plaintiff.

Thomas Cooch (of Morford, Bennethum, Marvel & 'Cooch), Wilmington, Del., Raymond F. Adams and Curt Von Boetticher, Jr., (of Adams, Forward & McLean), New York City, for defendant.

LEAHY, Chief Judge.

This is a patent infringement suit on two patents relating to aluminum paste pigment. Defendant originally sought summary judgment. This motion was rejected.[1] Thereafter, plaintiff amended its complaint, admitting past misuse, but alleging that such misuse had ended and any effects thereof had been dissipated. Defendant answered and denied termination of misuse and also plead "license" and "unclean hands." The defense of license was rejected.[2] Plaintiff moved for separate trial under FR 42(b) on the issue of misuse, the termination of it, and its consequences, if any. The motion was granted and trial had. The issues, now, are quite clear. Past misuse is admitted. There remains for decision the following points: 1. the extent of the misuse; 2. whether the misuse has terminated; 3. the effect of the misuse; and 4. what consequences, if any, of the misuse have terminated.

1. Plaintiff manufactures powdered metal, including copper, zinc, aluminum, lead and solder powders.[3]

---

1. Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 92 F.Supp. 896.

2. Metals Distintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 98 F.Supp. 201.

3. In 1931 the president of plaintiff, Everett

J. Hall, owned plaintiff company. He died in that year and control passed to his widow, Harriet L. Hall. Upon her death in 1944 control passed to their son and daughter, Harold and Jean, where it remained until 1951. Then control passed to American-Marietta Company.

2. Leafing aluminum paste is a raw metal compound containing between 50 and 75% of metal flakes of aluminum, used as a pigment for paint and inks. Leafing, as known in the industry, is that property imparted to aluminum particles which makes them float to the surface of the liquid in which they are carried, which results in a bright metallic lustre to the surface.

3. Before the appearance of aluminum paste, dry aluminum powder was used as a pigment. Today, the majority of the dry leafing aluminum powders is used for the making of aluminum paint, protective and decorative coatings.[4]

4. In 1931 plaintiff started its plant to make aluminum paste in Elizabeth, New Jersey. It manufactured aluminum paste until 1941 when national defense conditions caused shortages. Plaintiff stopped its aluminum pigment manufacture until controls lifted in 1945. Prior to 1945 plaintiff did not sell its aluminum paste directly to the trade, as it had a sales arrangement with U. S. Bronze and, under this arrangement, plaintiff supplied about 25% of aluminum paste to the market. The balance of the market, except for a negligible percentage, was supplied by Alcoa and defendant. 1946 changed the situation. Plaintiff then supplied only 8% of the market. The balance was supplied by defendant and Alcoa, the defendant's proportion having increased to 15%. In 1946 U. S. Bronze stopped selling plaintiff's aluminum paste and bought its requirements from defendant and Alcoa.

5. Plaintiff's history shows that it has granted six licenses under the patents in suit; but the licenses with defendant and with U. S. Bronze (circa 1939) are identical with respect to provisions fixing prices. Articles 3 and 20 of the agreements fix prices as to unpatented dry aluminum powder.[5]

6. Under the license agreements neither defendant nor U. S. Bronze had to fix prices unless 1. they desired to license their customers under plaintiff's patent and 2. the price at which they were then selling powder was less than a price calculated from a price base set on aluminum paste sold.

7. The rights of plaintiff under the price provisions of the licenses to defendant and U. S. Bronze were to receive a royalty if the licensees granted a sub-license. Plaintiff was to receive reports and royalties and in turn to furnish technical know-how and to prosecute infringers.

8. The misuses of the patents in suit are found in the licenses of November 29, 1939, between plaintiff and defendant and U. S. Bronze. In 1946 plaintiff was advised for the first time by defendant's attorneys that the agreements were violative of the antitrust laws. On November 1, 1946, plaintiff, upon counsel's advice, sent to defendant a proposed amendment to the license agreement which struck out the price fixing arrangement.[6]

9. Relations between the parties ceased after defendant refused to accept the pro-

---

4. In the years 1931 to 1933 the sources which furnished dry leafing aluminum powder to the trade included Alcoa, defendant, Malone Aluminum Bronze, Ohio Bronze Powder Company, Baer Brothers, Aluminum Bronze Powder Manufacturing Company and importations from European sources. Today this dry leafing aluminum powder is still furnished to the trade by the sources just named and a few new manufacturers, including plaintiff.

5. There were, apart from European sources, six suppliers of dry aluminum powder 1931–33. The Alcoa agreement was free of price fixing. Of the six suppliers of unpatented dry aluminum powder, only two, defendant and U. S.

Bronze, were parties to the price fixing arrangement.

6. The proposed amendment struck out Articles 3 and 20. In addition, the amendment proposed to rewrite Article 2 to remove from that Article all reference to stricken Article 3. Numerous other changes were suggested to stifle Article 3. In short, the amendment proposed to eliminate the principal price fixing Article 3, the subsidiary of Article 20, and all reference to any other Article suggesting price fixing provisions. Defendant refused to accept plaintiff's proposed amendment on the ground there was no allowance made for rebate of royalties theretofore paid by defendant.

posed amendment in November, 1946; and, since 1947, neither party requested performance of the other. Defendant, having refused to execute the proposed amendment to the license, thereafter plaintiff never asked for any further royalty payment and made no further performance under the November 24, 1939, agreement. Thus, it appears, plaintiff's misuse vis-a-vis defendant was terminated in January, 1947. Defendant, having refused to execute a formal document of amendment which would clearly show an act of abandonment as to misuse, plaintiff could do no more than cease to perform under the original license.

10. After consultation with counsel, in November, 1946, plaintiff sent to U. S. Bronze a proposed amendment which abolished the price fixing features in that particular license. On April 2, 1947, U. S. Bronze proposed the complete cancellation of its license. Plaintiff accepted. Both plaintiff and U. S. Bronze exchanged releases which freed each party of any obligation under the original license. Manifestly, plaintiff's misuse of its patents was terminated on April 3, 1947, when plaintiff and U. S. Bronze terminated their contractual relationship.

11. No material consequences of plaintiff's misuse of the patents in suit survived the termination of the misuse. The master facts demonstrate this. Article 3 of the license merely required price adjustment when the dry aluminum powder was to be made into paste under a special license granted by U. S. Bronze or defendant. As stated earlier, less than 5% of the total dry aluminum powder sold from 1941 was used for the making of aluminum paste. Of the six suppliers of dry aluminum powder to the industry, only two—U. S. Bronze and defendant—were subject to price fixing. Thus, the price fixing arrangements with defendant and U. S. Bronze did not control, in fact, the market price of dry aluminum powder in the industry. A significant fact is that performance under the price fixing arrangements *was at the discretion of defendant*. It was the sole judge as to whether it would sub-license its customers. Moreover, there is no factual support for any defense of "unclean hands." If plaintiff once had "unclean hands," such has been terminated in the same manner in which the misuse was terminated.

12. As a result of the findings of fact, as shown by the evidence, certain legal principles are applicable. For example, if a patentee who has misused his patents terminates the misuse, the patents are thereafter enforceable.[7] And, if no consequences remain, misuse patents again become enforceable.[8] Here, I think the plaintiff has purged itself of any misuse.

13. As I indicated in the earlier opinion,[9] defendant is on thin ice when it contends that because it was once a party to an illegal act it should benefit from its own wrongdoing and have insulation from any suit for infringement if, in fact, it is utilizing the inventions covered by plaintiff's patents. On the one hand, it refused to accept plaintiff's offer to amend the original license in order to terminate the illegal clauses there found. A licensee who has participated in a patent misuse cannot disregard the efforts of the licensor to terminate the misuse and thereby receive a free right to use patents free of any future royalty payment. To borrow a phrase from the late Judge O'Connell,[10] "I fail to perceive any cogent public interest" in rewarding a wrongdoer. Plaintiff has done everything to terminate the misuse. Defendant, the active price fixer, would appear to take the position that it desires to profit from the misuse. In short, defend-

7. Morton Salt Co. v. Suppiger Co., 314 U. S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367; Westinghouse Electric Corp. v. Bulldog Electric Products Co., 4 Cir., 179 F.2d 139, 145.

8. Sylvania Industrial Corp. v. Visking Corp., 4 Cir., 132 F.2d 947, 958; Campbell v. Mueller, 6 Cir., 159 F.2d 803, 807; Eastern Venetian Blind Co. v. Acme Steel Co., 4 Cir., 188 F.2d 247, 254.

9. D.C.Del., 98 F.Supp. 201.

10. Reynolds Metals Company v. Metals Disintegrating Company, Inc., 3 Cir., 176 F.2d 90, 91, 92.

ant's position is that plaintiff's patents may be enforceable against every one except as against defendant.[11]

My definitive conclusion is that the admitted misuse was terminated by April, 1947; and no illegal clauses survived that termination.

11. "The Court: Well, under your theory anybody is at liberty to utilize the invention covered by these patents without the payment of royalty.

"Mr. Adams: Well, I don't want to say anybody. I would like to be very specific at this point."