**METALS DISINTEGRATING COMPANY, *Inc., Plaintiff,***

**v.**

**REYNOLDS METALS COMPANY, Defendant.**

**Civ. No. 1120.**

United States District Court, D. Delaware.

March 11, 1955.

Arthur G. Connolly (of Connolly, Cooch & Bove), Wilmington, Del., W. D. Keith and Paul S. Bolger, New York City, for plaintiff.

James R. Morford (of Morford & Bennethum), Wilmington, Del., Raymond F. Adams and Curt Von Boetticher, Jr., New York City, for defendant.

LEAHY, Chief Judge.

This is a patent infringement suit. Patent No. 2,002,891 covers a method of producing leafing pigments and also covers a leafing aluminum paste product. The other patent, No. 2,144,953, relates to an improved method of preparing a leafing aluminum paste pigment. Defendant, alleging misuse of patents, initially brought a motion for summary judgment which aimed at dismissal of this action. Later, plaintiff amended its complaint, alleging any prior misuse of the patents had ended and the effects of misuse had been dissipated. Defendant's motion for summary judgment was denied. Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 92 F. Supp. 896. Then defendant filed answer alleging unenforceability because of misuse and a defense of license. Plaintiff's motion to strike the defense of license was granted. Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 98 F.Supp. 201. Thereafter plaintiff moved for a separate trial of the misuse issue. After trial the court found the misuse terminated, the consequence dissipated, and the patents in suit enforceable as of April 3, 1947. Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105. Infringement and validity of the two patents in suit. No. 2,002,891, which expired May 28, 1952, and No. 2,144,953, which issued in 1939 and has not yet expired, are the present issues.

Claims Nos. 2, 3, 4, 5, 7 and 10 of '891 are here in issue. The present issues as to this patent are defendant's infringement of these claims in the period April 3, 1947, to the date of the expiration of the patent, May 28, 1952. Claims Nos. 1, 2, 3 and 4 of '953 patent are also in suit. Plaintiff withdrew claim 2. The precise issue as to this patent is whether defendant infringed any of claims 1, 3 and 4, in the period from April 3, 1947, to date. Defendant denies infringement and has attacked validity of all claims in suit. For the '891 patent, plaintiff seeks general damages. As to the '953 patent, plaintiff seeks injunctive relief and also general damages.

Opinion Including Findings of Fact.[1]

Plaintiff corporation is the successor of a company which was formed prior to 1917 and in which Everett J. Hall, an Assistant Professor of Columbia University, was a principal owner.[2] Plaintiff and its successor engaged in the manufacture of powdered metal, including copper, zinc, aluminum, lead and solder powder.[3] Aluminum powder has been an article of commerce for years and has been used for chemical purposes, ingredient in fireworks, incendiary, and pigment purposes.[4]

The issues deal with defendant's infringement of the patents in suit in the manufacture of aluminum powder and aluminum paste, a product which con-

1. To an extent, some of the findings are duplicates of findings made by the court in the trial of previous issues. Where it appears any findings have been previously considered by the court, reference will be made to the numbered paragraph in the former decisions.

2. Hall, R. 77, 78, 79; Ruhl, R. 211, 215.

3. Hall, R. 31, 32, 35, 253; also see Paragraph "1", Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105.

4. See Statement of Defendant's counsel, R. 204; Ruhl, R. 237; Hall, R. 260; DX 20, pages 10 and 13.

tains aluminum powder, for pigment purposes, where the aluminum powder or aluminum paste is in the form of "leafing". Prior to 1930, the only leafing aluminum pigment which was an article of commerce was manufactured and sold in the form of dry aluminum powder.[5]

A leafing aluminum pigment contains aluminum flake powder, the powder flakes having had the quality of leafing imparted to them during manufacture. Leafing as known in the industry is that property imparted to aluminum particles which makes them rise to the surface of the vehicle or liquid in which they are carried to orient themselves at the surface to give a bright metallic luster to the surface.[6] The principal suppliers of this dry leafing aluminum powder prior to 1930, were Aluminum Company of America and the United States Bronze Powder Works, Inc. Defendant, Reynolds Metals Company, was also a supplier.[7] Prior to 1930, plaintiff company did not engage in the manufacture or sale of any leafing aluminum pigments.[8] About 1917, Professor Hall developed a ball milling method for producing various types of powdered metals, including copper and aluminum. For this method, he obtained U. S. patent No. 1,569,484.[9] When this method was applied to aluminum, it produced an aluminum powder known as aluminum flake salable to the fireworks industry in the pyrotechnic field for flares and other incendiary fields. This aluminum powder did not have the ability to leaf and was not a leafing aluminum pigment.[10] Prior to 1930 leafing aluminum powder had been made commercially by a stamping process in which small particles of aluminum were placed on an anvil and pounded into small flakes by repeated blows of mechanical hammers. During the stamping a lubricant was used to facilitate the process. After the stamping operation the aluminum flakes were polished with a leafing agent to impart the leafing quality to the flakes. Thereafter the polished powder was stored for 30 to 60 days to improve the leafing characteristic.[11] Prior to 1929, attempts were made by plaintiff to make leafing aluminum pigment by the ball milling process which had been invented by Hall in 1917 and patented by him.[12] These attempts were unsuccessful. Efforts to impart leaf to the aluminum flaked product produced by this ball milling process by polishing those flakes were also unsuccessful.[13]

As To Patent '891.

1. About 1929, Hall devised a new ball milling process by which leafing aluminum pigment could be produced; and devised a new stable leafing aluminum pigment which was principally composed of leafing aluminum flakes dispersed in a liquid carrier such as mineral spirits which was innocuous to the leafing film.[14]

Plaintiff started to manufacture this leafing aluminum paste product invented by Hall in 1930 at its plant in Elizabeth, New Jersey. This was the first time a leafing aluminum pigment had been in paste form.[15] This development

5. Mandle, R. 405; Hall, R. 34, 282; Furnas, R. 304; see Paragraph "3", Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105, at page 106.

6. Hall, R. 33, 88, 89; Ruhl, R. 220, 221; Carrick, R. 377; also see Paragraph "2", Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105, at page 106.

7. Hall, R. 259; Furnas, R. 304; Mandle, R. 404, 405.

8. Ruhl, R. 221, 222–225; Hall, R. 260.

9. DX 8.

10. Ruhl, R. 222, 223; Hall, R. 260.

11. Hall, R. 258, 259; Furnas, R. 304, 305, 306, 333, 334, 354; Mandle, R. 402, 403, 404.

12. U. S. patent No. 1,569,484, DX 8.

13. Ruhl, R. 222, 223, 224.

14. Ruhl, R. 221, 241, 242; Mandle, R. 405, 406; Hall, R. 32, 33; the inventions are described and claimed in the patent in suit '891, PX 32.

15. Ruhl, R. 241, 242; Hall, R. 260; Mandle, R. 405, 406.

of the leafing aluminum paste pigment attracted the attention of the dominant suppliers of leafing aluminum powder pigment: United States Bronze Powder Works, one of the dominant suppliers of the dry leafing aluminum powder, which was up to that time the aluminum pigment of the industry, solicited and obtained in 1930 the right to sell plaintiff's production of this new aluminum paste pigment and continued to sell plaintiff's production of this new pigment until about 1945, when plaintiff started to sell directly to the public;[16] Aluminum Company of America, the other dominant supplier of leafing aluminum powder pigment, started, in 1931, negotiations for a license from plaintiff and, in 1933, acquired from plaintiff a license to manufacture and sell the leafing aluminum paste.[17] Defendant also took action after Hall developed leafing aluminum paste pigment. Before Hall's death, in September, 1931, defendant had expressed its interest in the product to him. Following Hall's death defendant suggested to plaintiff the consolidation of the defendant and plaintiff company.[18] The offer of consolidation failed. Then defendant in 1934 installed ball milling equipment for the manufacture of leafing aluminum paste pigment and began manufacture and sale of the paste in 1936. It installed further ball mills, all of which it has continued to use through the years in the manufacture of the leafing aluminum paste.[19]

Defendant began manufacture of its No. 30 and No. 40 grades of leafing aluminum paste in 1936 and 1938, and these represent the bulk of defendant's total production in the period 1947 to date.[20] As a result of defendant's early activities in the manufacture of leafing aluminum paste pigment, plaintiff, on December 24, 1938, brought action against defendant in this court, alleging infringement. The action was dismissed upon stipulation of the parties following the execution by plaintiff and defendant of a license, dated November 29, 1939.[21] The history of the relations of the parties is fully set forth in Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105.[22]

The leafing aluminum paste pigment developed by Hall offered many advantages over the dry leafing aluminum powder pigments. When used in a paint, it produced a more brilliant and smoother finish than was obtained by the use of the dry leafing aluminum pigment. It had greater opacity. It produced paints with greater coverage, the covering power of a paste, containing only 65% of aluminum, being greater than that of an equal weight of the dry leafing powder which was composed entirely of aluminum. When used to produce inks, the resultant ink had improved consistency and free flowing qualities. The leafing aluminum paste had better mixing qualities. Moreover, the explosion and fire hazards incident to the handling by workmen of the dry leafing aluminum powder, and the contamination caused by floating or dusting of dry leafing aluminum powder in the air of plants using aluminum pigments, were eliminated by the use of the leafing aluminum paste pigment.[23] As stated before, in 1930, before plaintiff began manufacture of Professor Hall's leafing aluminum paste pigment product, the only leafing aluminum pigment made and sold in the industry was the dry leafing aluminum powder. By 1934 the new leafing aluminum paste pigment occupied about 15 to 20% of the total market. By the end of 1939 about 65 to 70% of the total leafing

16. Mandle, R. 406 to 408; Ruhl, R. 243; Hall, R. 44, 82, 261, 262.

17. Ruhl, R. 245, 246; also, PX 1.

18. Ruhl, R. 243 to 246; PX 25, 26, 27 and 28; Hall, R. 74 to 76.

19. Furnas, R. 317, 312, 308, 309.

20. Furnas, R. 329, 330, 331.

21. PX 3.

22. Also, Id., D.C.Del., 92 F.Supp. 896; Id., D.C., 98 F.Supp. 201; and DX 11 and DX 12.

23. Hall, R. 263, 264, 271; Mandle, R. 401, 411, 412, 413.

aluminum pigment market was furnished by the leafing aluminum paste pigment. In 1952 the leafing aluminum paste pigment occupied 80 to 85% of the total market.[24]

The process of ball milling developed by Hall in 1930 is usable to manufacture either the new leafing aluminum paste pigment developed by him or dry leafing aluminum powder pigment, and has been used by plaintiff and defendant to make both pigments.[25] The process of ball milling developed by Hall in 1930 for the making of leafing aluminum pigments and described and claimed in the '891 patent is superior in many respects to the then used stamping methods of making dry leafing aluminum pigment. Among the advantages of Hall's new process are reduction of the costly explosion hazards which were present in the stamping operations; reduction in the amount of machinery and buildings necessary to make an equivalent amount of leafing pigment; elimination of the separate polishing and aging steps necessary to develop leafing in the stamped powders but not necessary in Hall's ball milling method; ease of production control of the ball milling method, reflected in a more uniform product than produced in stamping operations; and less need for skilled labor in the Hall ball milling method.[26]

As To Patent '953.

2. Several years after Hall's leafing aluminum paste pigment was placed on the market, plaintiff encountered difficulties affecting the leafing properties of the paste. These difficulties stemmed from carelessness of workmen in handling unsealed cans, and the effect of shipping or storage at elevated temperatures. These difficulties were not of frequent occurrence but were unpredictable, and presented a marketing problem.[27] These problems were met by the inventions of Othon Z. Ziehl, an employee of plaintiff, who discovered that additional quantities of leafing agent placed in the formed leafing aluminum paste to produce a stabilization reserve therein minimized or prevented the occurrence of such difficulties. The methods of Ziehl are the subject of the '953 patent.[28]

Defendant's Views.

3. In looking at the environment of the invention in suit, defendant's major view is that long before the second Hall patent, even before the first Hall patent, leafing aluminum powders were produced by grinding or disintegrating the metal in stamp mills and then polishing the flakes from the stamp mills with a leafing agent, specifically stearic acid. And before 1920, the ordinary ball mill was a known grinding device and its mechanical advantages lead to attempts to use it in place of stamp mills for this purpose at least as early as 1924, but the simple substitution did not produce anything of commercial consequence.

In this environment, defendant admits Hall made an important contribution, i. e., the concept of grinding aluminum metal in a ball mill with a liquid such as mineral spirits. This contribution centered in the addition of a liquid or thinner such as mineral spirits during milling. Defendant claims this operation is known as "wet ball milling" and is the subject matter of the first Hall patent. Mandle and Hall both admitted the operation described in the first hall patent is a wet ball milling process and where a distinction between powder and paste but not between leafing and non-leafing is suggested. Defendant argues the testimony that the operation described in the first Hall patent produces a leafing product, is uncontradicted and that the Ruhl testimony is not to the contrary. In quoting from two claims of the first Hall patent, defendant states this operation was not only disclosed but was also claimed in this first Hall patent:

24. Hall, R. 262, 263, 272.

25. Hall, R. 463, 464, 465; Furnas, R. 328.

26. Hall, R. 268, 269; Mandle, R. 409, 410.

27. Hall, R. 265, 266.

28. Hall, R. 266; PX 33.

"4. As a step of the process of disintegrating metals in a ball-mill or the like keeping the metal under treatment covered with a liquid consisting of a plurality of ingredients having a definite boiling point which forms with the metal particles, in the operation of the mill, a homogeneous mixture like a thick cream, sludge or emulsion which is tenacious, cohesive and adhesive and resistant to separation or segregation of its constituents and to the destruction of its own continuity and which maintains a substantially uniform, continuous and homogeneous character during the disintegration."

"5. The method of disintegrating metal in a ball mill or the like which comprises keeping the metal well covered with a liquid comprising a large proportion of a relatively readily vaporizable oil, and a small proportion of a grease having a boiling point higher than that of the oil, and when the disintegration is completed, driving off from the metal particles the readily vaporizable oil without disturbing the grease."

Upon this defendant asserts the "liquid consisting of a plurality of ingredients" of claim 4 was disclosed specifically as a mixture of mineral spirits or varnolene and stearine or grease, and in this art, "grease" is synonymous with "stearic acid" and "stearine" is synonymous with "stearic acid". Furthermore, defendant says the Ziehl patent in suit also states these leafing or floating agents including stearic acid specifically are called greases in the art; and that plaintiff's solicitor, in April of 1934, represented to the Patent Office that the liquid mixture of the first Hall patent '484 was a "varnolene-stearic acid solution".

Defendant's contention is wet ball milling practices and products are the subject matter involved in the issues; and that these practices and products are described by plaintiff's witness Hall:

"Q. The leafing aluminum powders of commerce consist of almost but not quite 100 per cent. of aluminum metal and a small amount of the leafing agent? A. That is right.

"Q. And the leafing aluminum pastes in addition to the aluminum and leafing agent also contain a thinner? A. That is right.

"Q. And the weight relationship of the aluminum to the entire weight of the leafing aluminum pastes of commerce may run from 65 per cent. upwards? A. No, there are some on the market that are as low as 50 per cent.

"Q. How high do they get? A. I am familiar with those as high as 73½ per cent.

"Q. But they still might contain either more or less than that and still be a leafing aluminum paste? A. That is right.

"Q. You outlined the wet ball mill process of making paste for us, and I would like to go through that again. You start by charging a ball mill with some disintegrated aluminum metal and a leafing agent such as stearic acid and a thinner such as varnolene? A. That is right.

"Q. Then you operate that mill for whatever period is required and then discharge the contents of the mill into a filter? A. That is right.

"Q. Then in the filter what you do is separate the excess liquid from the filter cake? A. That is right.

"Q. And the excess liquid will be the thinner or varnolene with the leafing agent or stearic acid that is not left on the particles of the pigment in solution in it? A. That is right.

"Q. Then you put that material in a mixing tank where you adjust the proportions of the thinner and the leafing agent? A. Right.

"Q. Now, if in following that process through to make a dry leafing aluminum powder, you would take the material either from the mill or more probably the filter cake and put it in a dryer and evaporate the thinner? A. Right."

From this, defendant claims the contents of the mill are flushed into the filter with additional thinner added for this purpose which also serves to wash the filtered material; the filter cake, with any adjustment of liquid content deemed necessary, is the leafing paste product, and if the filter cake is dried it becomes the leafing powder product; and these were the wet ball milling practices used alike by plaintiff and by defendant and by plaintiff's licensee, the Aluminum Company of America, in the production of the leafing aluminum powders and the leafing aluminum pastes of commerce, as just quoted from Hall. Defendant says these practices and products were also the practices described in the first Hall patent; and through the first Hall patent, plaintiff has had all of the monopoly to which it is entitled. Defendant has argued at length with a factual statement, item by item, of the three elements to be compared in determining the question, namely the claims in suit, the disclosure of the first Hall patent '484 and the defendant's practices and products.

It is defendant's contention if infringement be examined in terms of substance, there must be doubt as to infringement of the second Hall patent '891 by defendant's production of leafing paste products, since defendant's practice is a different practice including processing in addition to the removal of liquid following the ball milling operation. And, if correct in its position that nothing to be found in defendant's practices or products can be characterized as an advance patentable to plaintiff over the disclosures of the first Hall patent '484 (not in suit and now expired), a conclusion defendant's practices and products were embraced by claims of the patents in suit would then establish an identity with the practices and products of the first Hall patent which would compel a conclusion the patents in suit were invalid. Thus defendant concludes the primary question is validity of the patents in suit over the first Hall patent in the environment of the art in which the first Hall patent appeared; put in another way, this question is whether the subject matter of the claims in suit identify any contribution of plaintiff's patentees representing a patentable advance in this art. The patents in suit, on this question, it is true, can derive no benefit from any practice or the advantages of any practice disclosed in the first Hall patent but must, to be valid, be distinguished from such practices and advantages by the specific margins required as a premise for patentability.

It is defendant's position the Hall patent '891 is anticipated and lacks invention over the earlier Hall '484. It is substance, not words, which should control, says defendant, and the disclosures of the first Hall patent '484 and of the second Hall patent '891 are both to be so measured. This view is: although the word "leafing" does not appear in the first Hall patent, it is immaterial since the same leafing agent used in defendant's practice is, in the first Hall patent, identified by terms, "grease" and "stearine", which in this art are synonymous with the words, "stearic acid", used in the second Hall patent to identify the same known leafing agent. Likewise oxygen is available in the operation described in the first Hall patent; the atmosphere has access to the material in process in an ordinary ball mill through the open trunnions characteristic of such mills. The protection against the atmosphere to which the first Hall patent refers is provided by the liquid mixture used as a vehicle in the mill and not by excluding the atmosphere. To diminish risk of explosion, the first Hall patent suggests options; water cooling of the mill, one of these options which does not involve any exclusion of the atmosphere, is the practice followed by defendant. Protection against the atmosphere is accomplished by the use of the liquid mixture which makes the ball milling wet in the same way in defendant's practice, and in the operation of the first Hall patent.

Thus in arguing defendant's practice follows the prior art, defendant claims

the several steps of defendant's practice here charged to infringe, follow, step by step, the operation described in the first Hall patent '484. In sum, these steps comprise charging an ordinary ball mill with disintegrated aluminum and a liquid mixture comprising a thinner such as mineral spirits and a leafing agent such as stearic acid or stearine, operating the mill until the charge is reduced to a thick cream or sludge, adding additional quantities of thinner and leafing agent, as required during the operation, flushing the charge from the mill to a filter with additional quantities of thinner, and finishing the product either by filtering or by filtering followed by drying. The dried product is a leafing powder. The filtered but undried powder is a leafing paste. In making the paste, defendant says it adjusts the proportion of thinner and leafing agent by appropriate additions after the filtering; and the second Hall patent in suit is not concerned with these adjustments, but states the material as it comes from the mill without further processing other than the removal of liquid, is a finished paste. Defendant points out the proportion of metal to the total of thinner and metal, ranges from less than 50% to more than 73%. So, adjustment of the proportion of thinner to meet such variations in specifications could in no event amount to invention. And adjustment of the proportion of leafing agent to maintain the coating of grease or leafing film specified as characteristic of the product in the first Hall patent, could likewise in no event amount to invention.

For the remainder of defendant's position, as to plaintiff's Ziehl patent '953 in suit, anticipation and lack of invention condemn it over the first Hall patent '484. Ziehl patent '953 is said to be invalid over the first Hall patent '484 issued more than ten years before the application for the Ziehl patent was filed. 35 U.S.C. § 102(a), §§ 102(b), 103; the period of one year specified in § 102(b) does not apply in the case of applications filed before August 5, 1940, but with respect to a patent granted on such applications that period is two years instead of one year, § 4 of Act July 19, 1952, subd. (d), 35 U.S.C. note preceding § 1. And in this connection defendant argues the evidence tends to prove plaintiff itself was incorporating additional quantities of stearic acid in adjusting the proportions of thinner and leafing agent of the filter cake produced by filtering off excess thinner after the milling for years prior to June of 1936 when the application for the Ziehl patent was filed. Moreover, Ziehl is said to lack invention over Harris patent 2,234,164. In short, defendant contends Ziehl patent '953 in suit is invalid over the Harris patent 2,234,164 issued on an application filed December 1, 1934, more than seventeen months before the earliest date established for the Ziehl patent. 35 U.S.C. § 102(e).

### As To Infringement of the Product Claims Nos. 3 and 10 of Patent '891.

4. Defendant's grades of paste, Nos. 30 and 40, represent the bulk of its production of leafing aluminum paste in the period 1947 to date.[29] The first shipment of No. 30 by defendant was made June 29, 1936. The first shipment of No. 40 by defendant was made in 1938. Procedures used by defendant to make these grades of paste in the ball mills has not changed since 1938, and the pastes, therefore, were the same in the period in which defendant purported to recognize the patents (1939 to 1946) as in the period here at issue (1947 to date).[30] Defendant's plant manager, Mr. Furnas, described the process used for manufacture of No. 30 and No. 40 paste in 3-foot ball mills in the period 1934 or 1935. He noted a change made in 1938. The 3-foot diameter ball mill was the only kind operated by defendant until 1947, at which date some 4-foot diameter ball mills were obtained. Except for size of charge caused by the use of the larger diameter

29. Furnas, R. 330.

30. Furnas, R. 329, 330, 331; and R. 309 to 325, inclusive.

mills the operations in all mills were substantially the same. After Furnas described these operations, he was asked:

"Q. Is the procedure that you have described of ball milling in these three-foot by nine-foot mills and the four-foot by twenty-two-foot mills the procedure that you used in the period 1947 to date for the manufacture of No. 30 grade aluminum paste?

and answered: A. Yes, that is the procedure we have in effect now."

Furnas then stated the only difference in procedure between No. 30 and No. 40 paste manufacture was the number of hours the ball mill operates.

Samples of No. 30 and of No. 40 examined by plaintiff's witness, Professor Carrick of the University of Michigan, were samples of defendant's paste representative of the No. 30 and No. 40 leafing aluminum paste manufactured and sold by defendant in the period April, 1947, to May, 1952. Dr. Carrick examined two sets of samples of defendant's No. 30 and No. 40. The three samples of paste No. 30 and the one sample of paste No. 40 were purchased in New York; St. Louis, and San Francisco. The drums in which these samples were purchased bore the name of defendant, Reynolds Metals Company. These markings of defendant's name, grade number and lot number appear on the photographs of the drums containing the samples, which photographs were taken at the request of Carrick upon his receipt of the samples. The lot number on each of the samples are numbers used by defendant to identify various lots of paste of its manufacture. Comparison of the listed lot numbers on the samples purchased by plaintiff shows in each case the lot of paste represented by the sample was manufactured after April 3, 1947.

In the period April, 1947, to May 28, 1952, defendant, I think, appropriated the invention set forth in claim 3 of '891 in the manufacture and sale of its No. 30 and its No. 40 leafing aluminum paste. Carrick's evidence, the examination of various samples of defendant's No. 30 and No. 40 paste, taken with the evidence given by defendant's employee Furnas and the witness Tour, supports this finding as is shown by a comparison of the words of claim 3 with the evidence as comparatively demonstrated in Appendix "A", infra.

In the period April, 1947, to May 28, 1952, defendant appropriated the invention set forth in claim 10 of '891 in the manufacture and sale of its No. 30 and No. 40 leafing aluminum paste. Evidence of Dr. Carrick, who examined various samples of defendant's No. 30 and No. 40 paste, taken with evidence given by defendant's employee Furnas and witness Tour, supports this finding by a comparison of the words of claim 10 with the evidence, as also shown in Appendix "B", infra.

Facts As To Defendant's Infringement of the Method Claims Nos. 2, 4, 5 and 7 of Patent '891.

5. The methods used by defendant in the period April, 1947, to May, 1952, in the manufacture of leafing aluminum pigment follow closely the disclosure of the '891 patent. Evidence supporting the present finding is given by defendant's plant manager, Furnas. A comparison between the words of the patent and the testimony of Furnas is found in Appendix "C", infra.

In the period April, 1947, to May 28, 1952, defendant appropriated the invention set forth in claim 2 of '891 in the manufacture of leafing aluminum pigment. This finding is supported by the comparison of the words of the claim with the evidence and shown in Appendix "D", infra.

In the period April, 1947, to May 28, 1952, defendant appropriated the invention set forth in claim 4 of '891 in the manufacture of leafing aluminum pigment. This finding is supported by the comparison of the words of the claim with the evidence and shown in Appendix "E", infra.

In the period April, 1947, to May 28, 1952, defendant appropriated the invention set forth in claim 5 of '891 in the

manufacture of leafing aluminum pigment. This finding is supported by the comparison of the words of the claim with the evidence and shown in Appendix "F", infra.

In the period April, 1947, to May 28, 1952, defendant appropriated the invention set forth in claim 7 of '891 in the manufacture of leafing aluminum pigment. This finding is supported by the comparison of the words of the claim with the evidence and shown in Exhibit "G", infra.

Facts As To Defendant's Infringement of Claims 1, 3 and 4 of Patent '953.

6. The methods followed by defendant in the period 1947 to date in its manufacture of leafing aluminum paste are the same as those described in '953 to Ziehl. Application for patent '953 was made June 13, 1936, and the patent was granted January 24, 1939. The preferred method of the patent is stated in a paragraph thereof starting at page 2, column 1, line 12:

"In the preferred method the paste is formed by simultaneous flaking and leafing by impact grinding in a ball mill in the presence of a liquid thinner and a leafing agent, the product thus obtained being then filtered to form a relatively dry filter cake, and thereafter formed into a paste by mixing the fiber [sic] cake with a thinner and the floating or leafing agent. It is advisable as indicated above to mix the mill paste with thinner or solvent prior to or during its filtration. The amount of leafing agent added to the filter cake is preferably equal to 1% of the weight of the metal."

Evidence shows defendant in making its paste formed it by simultaneously flaking and leafing by impact grinding in a ball mill in the presence of a liquid thinner (mineral spirits) and a leafing agent (stearic acid) and then filtering the ball mill product to form a relatively dry filter cake. Before removing the ball mill charge and sending it to the filter additional mineral spirits were added. After filtering defendant added mineral spirits to adjust the paste back to the consistency desired.

In 1938 defendant began to add to the filter cake after the filtering operation mineral spirits and 1 per cent by weight (of the filter cake) of stearic acid. That amounted to the addition after filtering of 0.7 per cent (by weight of the metal) of stearic acid. The record shows this process was used thereafter and to date for No. 30 and No. 40 pastes. In the period April, 1947, to date defendant appropriated the invention set forth in claims 1, 3 and 4 of '953 in the manufacture of leafing aluminum paste. Evidence supports the findings. To a large extent the words of claims 1, 3 and 4 are identical. The identical words of all of these claims have been compared with the evidence, as comparatively demonstrated in Appendix "H", infra.

Plaintiff Proved Validity.

7. Evidence shows manufacturers of dry leafing aluminum pigment, the *only* leafing aluminum pigment known in 1929, including defendant, moved quickly once Hall's invention of leafing aluminum paste was known, not only to market this new product, but also to obtain an exclusive license or some exclusive position in respect to it. Defendant sought to consolidate with Hall's small company; the U. S. Bronze Company sought to sell the output of Hall's company, and the Aluminum Company of America sought an exclusive license. All these moves were made within a year of the time Hall introduced his new product. These acts are *res gestae* and loom in the evaluation of the inventive thing. Nor was the judgment of these manufacturers of the older pigment misplaced because Hall's new product, and new methods, came to replace the dry leafing pigment then manufactured by these established concerns, and the dangerous methods previously used by them have been discarded.

All of these concerns recognized the patents and all paid royalties for the use. In 1946, defendant concluded the license

arrangement under which it paid royalties for the use of the patents was illegal. Plaintiff gave defendant an immediate chance to cure the illegality which, if taken by defendant, would have probably prevented this suit. This failing, defendant took its present position of asserting it does not infringe the patents—on the application of basic patent law—on which it previously paid royalties and now charges such patents are invalid. Only conceded position as to validity so far expressed by defendant is found at Record pages 202 and 203. There defendant's counsel states defendant does "* * * not dispute that Professor Hall made an important and a patentable invention."; but contends it was contained in Hall's expired U. S. patent 1,569,484 for which he made application in 1919, which issued January 12, 1926, and expired January 12, 1943.

8. The first Hall patent, '484, does not disclose a process for making leafing aluminum flake pigment. The Patent Office allowed Hall '891 after consideration of Hall's first '484 patent and after the same type of argument here used by defendant had been advanced. The fact the Patent Office considered Hall's '484 patent in awarding to Hall the '891 is entitled to weight and increases defendant's burden to advance convincing proof in support of its arguments for invalidity. The Hall '484 patent was first cited by the Patent Office against the claims asserted by Hall in his application for '891 patent on December 30, 1932, in the Office Action of that date.[31] In the reply of applicant Hall, dated June 28, 1933, applicant pointed out the '484 patent made a point of excluding oxygen and did not disclose a leafing powder. In its next action, dated October 6, 1933,[32] the Patent Office repeated the objection based on the '484 patent. The applicant Hall answered, again pointing out the '484 patent was silent as to the phenomena of leafing or mirroring and it did not teach the art how to produce either a paste or powder having the leafing quality. Thereafter, the Patent Office withdrew the '484 patent as reference and allowed the claims here in suit.

9. Acts of defendant in the period 1929–1936 and thereafter are not consistent with defendant's present position the first Hall patent '484 discloses the invention of the '891 patent. It is defendant's position in one place Hall made "an important and a patentable invention",[33] but says defendant, this invention was that of the first Hall or '484 patent. The facts of record do not bear out this contention of defendant.

Hall '484 patent issued on January 12, 1926, but in 1929 defendant installed the old stamping process as its means of making dry leafing aluminum powder.[34] Hall announced his leafing aluminum paste and started manufacture in 1930. Hall died in September 1931. Defendant had contacted Hall prior to his death.[35] Immediately after Hall's death defendant sought his executor[36] and proposed consolidation of plaintiff company with defendant company[37] but plaintiff in its letter of January 5, 1932, turned down the proposition because "The point was brought out that while our patents regarding our aluminum development had not yet been granted, the time certainly would not be ripe to appraise the value of our organization which would have to be done in event of our two companies joining forces."[38] To which defendant replied on January 18, 1932, stating:[39] "We note your conclusion that in view of the status of your application for patents on your aluminum development you do not consider the time ripe to discuss a move of this kind." In

31. DX 19, Paper No. 7.

32. DX 19, Paper No. 9.

33. R. 202.

34. R. 303–5.

35. R. 245–6.

36. PX 25; PX 26.

37. PX 27; PX 28.

38. PX 27.

39. PX 28.

1934 defendant installed the ball mill equipment which it later used in manufacturing the product and producing the method here in dispute. On May 28, 1935, the Hall '891 patent here in suit issued. It was not until June 1936, that defendant went into commercial production.[40]

These facts show the interest of defendant in the "important and * * * patentable invention" of Hall did not arise in the period of the '484 patent but did arise immediately upon the making by Hall of the inventions which are claimed in his '891 patent. A significant fact is although defendant installed its ball mills in 1934 before Hall's '891 patent issued, defendant did not commercially produce until June, 1936, after the Hall '891 issued. In itself, this fact might not have master importance if it were not for the further fact the process used by defendant in June of 1936 follows the disclosure of the Hall '891 patent and did not follow the disclosure of the Hall '484 patent. The manner in which defendant followed the disclosure of the '891 patent is found in the following tabulation:

| Disclosure of Hall '891 | Defendant's Practice | Disclosure of Hall '484 |
|---|---|---|
| States 100 mesh is of convenient size. | Uses 100 mesh aluminum in all operations. | No mention of subject. |
| Describes ⅜″ balls specifically. | Uses ⅜″ balls. | No mention of subject. |
| Ratio of ball weight to metal of 20 to 1. | Ratio of ball weight to metal of about 23 to 1. | No mention of subject. |
| Ratio of 1 pound of aluminum to 1 pound of spirits. | Ratio of 1 pound of aluminum to about 1.2 pounds of mineral spirits. | Mention ratio of 1.5 pound of metal to ¾ pound of varnoline. |
| States 3% stearic acid satisfactory. | Uses 3.5% stearic acid. | Mentions .33% stearine. |
| Describes mill ⅖ full of balls (i.e. 40%). | Ball charge occupies 40% of volume of mill. | No mention of subject. |
| Oxygen must be available. | Pipes air into ball mill and uses volatile mineral spirits. | Requires metal be protected from atmosphere and states when volatile mineral spirits are used the air must be exhausted from the mill. |
| Recommends temperature of 50° C. but not above. | Operates at about 50° C. | No temperature mentioned. |

It cannot be sheer coincidence defendant's practice follows these specific items which are mentioned in the '891 patent but which are not to be found in the '484 patent, and any assumption of coincidence is rather strained when it ap-

40. R. 308.

pears defendant did not obtain commercial production in equipment installed prior to the issuance of the '891 patent but not until after the issuance of that patent.

10. Other facts have prime importance. Under the agreement of November 29, 1939, an arrangement was had where defendant could cancel at any time on twelve months' notice.[41] The first Hall patent '484 expired January 12, 1943. Defendant did not cancel. Instead, it paid royalties until the third quarter of 1946.[42] Thereafter, defendant brought action against plaintiff in the case of Reynolds Metals Co. v. Metals Disintegrating Co., the New Jersey action,[43] and offered to pay royalties into court because, as it stated in paragraph 9 of its complaint,[44] it would be irreparably injured in its business relating to aluminum paste if plaintiff, here, were to cancel the agreement for default. These are not controlling facts on the subject of validity but there is no doubt they are completely inconsistent with defendant's interpretation of the first Hall patent '484.

11. Acts of the industry itself, including defendant, are inconsistent with any allegation the first Hall patent '484 disclosed the revolutionary inventions of the second Hall patent '891. Issuance of the first Hall patent '484 in January, 1926, caused not a ripple in the industry. In 1927 Edwards, in fact, noted the stamping process is the method available for making a leafing product.[45] In 1929 defendant installed the stamping method.[46] But, advent of Hall's new method and product in 1930 attracted the industry. U. S. Bronze, Aluminum Company of America, and defendant, Reynolds Metals Company, soon moved by various methods to acquire the teachings of Hall's invention. Defendant wanted corporate merger with plaintiff, Aluminum Company wanted exclusive license, U. S. Bronze wanted and obtained (with some exceptions) exclusive sales rights of plaintiff's production.

12. Defendant has not carried its burden of attack on the issue of validity. The '891 patent has expired. The remaining question as to it is to damages. As to '953 patent, the prayer is for an injunction and damages. If such decree is entered, plaintiff states in its brief it will offer to defendant a license under '953, since while plaintiff seeks enforcement of its rights, it has no desire to prevent defendant, which it once recognized as a licensee, from pursuing its normal course of business if once again it assumes the role of licensee.

An appropriate order on both patents should be submitted.

Conclusions of Law.

A. Plaintiff is and has been the owner of patents Nos. 2,002,891 and 2,144,953 since their issuance. Title in the plaintiff was stipulated by the parties.

B. Patent No. 2,002,891 was valid and enforceable during the period April 3, 1947 to May 28, 1952. The patent is entitled to presumption of validity. Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 7, 8, 54 S.Ct. 752, 78 L.Ed. 1453; Drumhead Co. of America v. Hammond, D.C., 18 F. Supp. 734, 736, affirmed 3 Cir., 89 F.2d 241. Enforceability of the patent has been established for the noted period. Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105.

C. Patent No. 2,144,953 has been valid and enforceable during the period April 3, 1947 to date. This patent is also entitled to presumption of validity. Enforceability of this patent for the stated period has also been established. Metals Disintegrating Co., Inc. v. Reynolds Metals Co., D.C.Del., 107 F.Supp. 105.

41. See Article 16, PX 3.

42. PX 16; R. 38, 39.

43. Reynolds Metals Co. v. Metals Disintegrating Co., D.C.N.J., 8 F.R.D. 349, Id., 3 Cir., 176 F.2d 90.

44. DX 1.

45. DX 20.

46. R. 303.

D. Defendant has infringed product claims 3 and 10 of patent No. 2,002,891 in the period April 3, 1947 to May 28, 1952.

E. Defendant has infringed method claims 2, 4, 5 and 7 of patent No. 2,002,891 in the period April 3, 1947 to May 28, 1952.

F. Defendant has infringed claims 1, 3 and 4 of patent No. 2,144,953 in the period April 3, 1947 to date.

APPENDIX "A" *

(Appropriation of Claim 3 of '891)

| Words of claim 3 | Evidence |
|---|---|
| "As a new article of manufacture, a stable and homogeneous paste adapted for ready admixture with a paint vehicle, such as varnish, * * *" | Dr. Carrick's examination showed all samples of defendant's No. 30 and No. 40 paste were stable (see PX 79, lines 10, 11, 13 to 18, incl.) (see PX 80, lines 10, 16 and 18). "Stability" as measured in the '891 patent is stableness of leaf upon standing (see PX 32, page 3, col. 1, lines 13–17) or upon heating (see PX 32, page 3, col. 1, lines 46 to 52).<br><br>Dr. Carrick's examination showed all samples of defendant's No. 30 and No. 40 paste were homogeneous (see PX 79, line 9; PX 80, line 9). |
| "* * * including flake bronze powder having on its surface a leafing film, * * *" | Furnas testified the defendant's operations used to make leafing pastes Nos. 30 and 40 produced a thin, flat flake with a leafing film (R. 325). Carrick found all samples of defendant's pastes as determined by the methods of prevailing Federal specifications (see PX 79; PX 80, line 10, and R. 377, 378, 385). The word "bronze" is merely a designation which means aluminum flakes in the pigment art (Tour, R. 499). |
| "* * * the remainder of the paste comprising a paint thinner which is innocuous to the leafing film." | Furnas has testified the liquid ingredient of the paste is mineral spirits (R. 323, 324). That the mineral spirits used are innocuous to the leafing film is evident from Carrick's tests (PX 79, PX 80), and pastes Nos. 30 and 40 are made by defendant as leafing pastes (Furnas, R. 331). |

* All Appendices are directed to the infringement issue.

Appendix "B"
(Appropriation of Claim 10 of '891)

| Words of claim 10 | Evidence |
| --- | --- |
| "As a new article of manufacture, a wet pigment for admixture with a paint vehicle for the purpose of forming a paint, comprising flaked metal bronze powder, the powder flakes having on their surface a leafing film as evidenced by the ability of the flakes to leaf in a paint vehicle, such as varnish, * * *" | Defendant's No. 30 and No. 40 paste are "wet", i. e. as distinguished from a dry powder. Each contains metal flakes having on their surface a leafing film (Furnas, R. 325). Carrick in his tests of samples of defendant's No. 30 and No. 40 paste for leafing used Federal specifications (PX 56 and PX 55), which prescribe leafing tests for pastes for general paint use (see PX 56, PX 55; also R. 377, 378, 386). Carrick found all samples to leaf (see PX 79, line 10; PX 80, line 10). The word "bronze" merely indicates aluminum flakes in the pigment art (Tour, R. 499). |
| "* * * and being dispersed in a liquid carrier innocuous to the leafing film * * *" | The liquid carrier of defendant's paste is mineral spirits (Furnas, R. 323, 324). Such is innocuous to the leafing films as shown from results of Carrick's tests (PX 79, PX 80, line 10 of each). |
| "* * * and which forms with the flakes a stable paste in which the flakes retain their color and leafing quality during storage, as evidenced by the fact that the paste can be heated at temperatures up to about 50° C. without substantial impairment in those respects." | As Carrick's tests on the samples of defendant's Nos. 30 and 40 paste reported in PX 79 show, the flakes in defendant's paste retained their color and their leafing quality during a storage period of over six years (see PX 79, lines 10, 11 and 12). These same pastes on being heated at 50° C for periods varying from 20 minutes to 7 days did not undergo substantial impairment of leafing (see PX 79 and compare line 10 with lines 13 to 16, inclusive).<br><br>Samples of defendant's pastes which were tested as reported in PX 80 were not furnished plaintiff by defendant until June of 1953 (R. 335), and the six year storage test was not run on these samples. However, these samples were heated to 50° C for 7 days without any substantial impairment of leafing (compare line 10 of PX 80 with line 16 of PX 80). |

Appendix "C"

(Appropriation of Method Under '891)

| The '891 patent (PX 32) states | The Defendant's Operations |
| --- | --- |
| —that 100 mesh aluminum is a convenient size for the starting material which is charged into the ball mill (page 2, col. 1, lines 5 to 8). | —Defendant uses 100 mesh aluminum in all of its operations (Furnas, R. 309; R. 318.) |
| —The patent describes ⅜" diameter balls as useful (page 1, col. 2, line 49; page 2, col. 2, line 20 et seq.). | —Defendant standardized on balls of ⅜" diameter in all of its mills (Furnas, R. 309, R. 314). |
| —The patent describes the use of balls in a weight equal to a ratio of 20 to 1 of balls to aluminum as satisfactory (page 2, col. 2, lines 10 to 13). | —Defendant used a ratio of about 23.5 and about 23.1 to 1, respectively, in its 3-foot and 4-foot diameter mills. (Calculated from figures given by Furnas at R. 309 and R. 318.) |
| —The patent states that good results will be obtained with 1 pound of aluminum to 1 pound of mineral spirits (page 1, col. 2, lines 40 to 45). | —Defendant used 1.24 pounds of mineral spirits to 1 pound of aluminum in its 3-foot diameter mills and about 1.22 pounds of mineral spirits to 1 pound of aluminum in its 4-foot diameter mills (calculated from figures given by Furnas at R. 309 and R. 318, assuming a gallon of mineral spirits weighs 6.6 pounds, as stated by Furnas at R. 319). |
| —The patent states that 3% of stearic acid in the ball mill charge seems to be satisfactory (page 2, col. 1, lines 56 to 58). | —Defendant used about 3.5% of stearic acid in its mills (calculated from figures given by Furnas, R. 309–310; R. 317–319). |
| —The patent states that grinding time is influenced by the fineness desired (page 2, col. 2, lines 14 to 16). | —Defendant's plant manager Furnas states the length of time defendant's mills ran depended upon the fineness of the product desired (R. 309). |
| —The patent describes a mill about two-fifths (i. e. 40%) full of balls (page 2, col. 2, lines 55 to 57). | —Furnas testified the ball charge in defendant's mill occupied about 40 to 45 per cent of the volume of the mill (R. 314). |
| —The patent states that the action in the mill should be that of impact rather than attrition (page 2, col. 2, lines 36 to 75). | —In defendant's mills the speed is adjusted to obtain impact grinding instead of attrition grinding (Furnas, R. 327, 328), and lifting bars are used on the inside of the mill to obtain impact action (Furnas, R. 313). |

| | |
|---|---|
| —The patent states that the operation must take place in oxygen available atmosphere (page 1, col. 2, lines 15 to 20; page 2, col. 1, lines 28 to 44). | —In defendant's milling operation the mills are open to the atmosphere and air is actually piped to the mills for this purpose (Furnas, R. 320, 321). |
| —The patent states that 50° C is a satisfactory temperature for operation and that above 50° C there is a tendency to loss of leaf (page 3, col. 1, lines 8 to 11). | —Defendant operated its mills between 115 and 125 degrees fahrenheit, and preferred not to go above 120 degrees fahrenheit. A temperature of 50° C equals 122° fahrenheit (Furnas, R. 320). |

Appendix "D"

(Appropriation of Claim 2 of '891)

| Words of claim 2 | Evidence |
|---|---|
| "The method which comprises imparting the quality of 'leafing' or 'mirroring' to flake metal powder * * *" | Methods used by defendant in producing its No. 30 and No. 40 paste imparted leafing to the flake metal powder (Furnas, R. 325) (see also PX 79 and 80, line 10 of each). |
| "* * * by subjecting such powder to the action of a leafing agent dissolved in a volatile paint thinner with oxygen available * * *" | Patent '891 names stearic acid as a leafing agent (page 2, col. 1, lines 45 et seq.). Defendant uses stearic acid dissolved in mineral spirits (Furnas, R. 309–311; 318, 319; 347). Defendant positively insures that oxygen is available by piping air into its milling operations (Furnas, R. 320, 321). |
| "* * * the amount of liquid being sufficient to form a sludge with the metal, * * *" | In defendant's operations a thick, creamy sludge is formed containing about 48% solids, the balance being the liquid mineral spirits (Furnas, R. 322). |
| "* * * and thereafter removing excess liquid to leave the residue in the form of a substantially homogeneous stable paste." | At the end of the ball milling operation the sludge formed is filtered to remove mineral spirits to an extent that a cake is formed containing 70 per cent solids. To this cake is then added sufficient mineral spirits to get a paste of desired consistency such as one containing 60 to 65 per cent solids (Furnas, R. 322, 323). Such paste is stable and homogeneous. |

Appendix "E"

(Appropriation of Claim 4 of '891)

| Words of claim 4 | Evidence |
|---|---|
| "The method of producing bronze powder from metal particles, which comprises charging a ball mill with balls and with a quantity of the metal particles * * *" | "Bronze" powder is a term for flake powders such as aluminum in the pigment art (Tour, R. 499). Defendant charged its ball mills with balls and 100 mesh aluminum particles (Furnas, R. 309–310; 318, 319). |
| "* * * and a quantity of liquid containing in solution a leafing agent of the kind and for the purpose set forth, * * *" | The '891 patent discloses stearic acid as a leafing agent dissolved in a liquid such as a petroleum fraction (page 1, col. 1, lines 45 to 48; page 2, col. 1, lines 9 to 15).<br><br>Defendant uses stearic acid as a leafing agent in a quantity of liquid mineral spirits (Furnas, R. 309 to 311; 317 to 319). The stearic acid forms a solution with the mineral spirits (Furnas, R. 347). |
| "* * * which imparts a leafing film to the metal and forms a creamy sludge with the metal in the operation of the mill * * *" | The ball milling operations of defendant produced aluminum flakes having a leafing film on their surface (Furnas R. 325).<br><br>In defendant's ball milling operations a thick, creamy sludge is formed (Furnas, R. 322). |
| "* * * rotating the mill with oxygen available at such speed as to cause cataracting of the balls and to throw them clear of the mill shell and ascending balls, * * *" | In defendant's operations speed and lifting bars are used to obtain impact grinding (Furnas, R. 313, 327, 328). The lifting bars lift the ball so that defendant obtains a cataract action (Furnas, R. 314). This is the method described in '891 where the lifting bars are called "internal ribs" (see page 2, col. 2, lines 36 et seq. of the patent.)<br><br>In defendant's operation oxygen is made available by piping air into the ball mills (Furnas, R. 320, 321). |

| | |
|---|---|
| "* * * continuing the rotation until the metal has been brought to the desired fineness and flake form, * * *" | Defendant produced a flake form in its operations (Furnas, R. 325). Defendant continued rotation for a time depending on the fineness of the product desired (Furnas, R. 309). |
| "* * * maintaining in the mill a temperature favorable to the creation and maintenance of the leafing film, * * *" | The '891 patent teaches 50° C is a satisfactory temperature of operation and above that temperature there is a tendency to destroy leafing (page 3, col. 1, lines 8 to 11). Defendant operated its ball milling at between 115 and 125 degrees fahrenheit and preferred not to operate above 120 degrees fahrenheit (which is 50° Centigrade) (Furnas, R. 320). |
| "* * * removing the sludge from the mill, and reducing the proportion of liquid to metal to such an extent as to produce a substantially homogeneous bronze powder paste." | At the end of the ball milling operation the sludge formed is filtered to remove mineral spirits to an extent a cake is formed containing 70 per cent solids. To this cake is then added sufficient mineral spirits to get a paste of desired consistency such as one containing 60 to 65 per cent solids (Furnas, R. 322, 323). Such paste is stable and homogeneous. |

Appendix "F"

(Appropriation of Claim 5 of '891)

| Words of claim 5 | Evidence |
|---|---|
| "A method which comprises imparting the quality of 'leafing' or 'mirroring' to flake aluminum powder by subjecting such powder to the action of a leafing agent dissolved in a volatile paint thinner, *and in the presence of an oxygen* containing atmosphere, * * *" | Methods used by defendant in producing its No. 30 and No. 40 paste imparted leafing to the flake metal powder (Furnas, R. 325) (see also PX 79 and 80, line 10 of each).<br><br>Patent '891 names stearic acid as a leafing agent (page 2, col. 1, line 45 et seq.). Defendant uses stearic acid dissolved in mineral spirits (Furnas, R. 309–311; 318, 319, 347).<br><br>Defendant positively insures oxygen is available by piping air into its milling operations (Furnas, R. 320, 321). |

| | |
|---|---|
| "* * * forming a leafing film comprising aluminum stearate upon such particles and removing the liquid and preventing loss of the leafing film." | Carrick in his analyses of defendant's pastes Nos. 30 and 40 found aluminum stearate which he identified as the "combined grease" (See R. 371, 372, 376, 389 and PX 79 and 80, line 8). Defendant removed liquid after the ball milling operation without loss of leafing film in order to produce a dry leafing aluminum powder (Furnas, R. 328). |

Appendix "G"

(Appropriation of Claim 7 of '891)

| Words of claim 7 | Evidence |
|---|---|
| "The method which comprises imparting the quality of 'leafing' or 'mirroring' to flake metal powder by subjecting such powder to the action of a leafing agent dissolved in a volatile paint thinner, and in the presence of an oxygen containing atmosphere * * *" | Methods used by defendant in producing No. 30 and No. 40 paste imparted leafing to the flake metal powder (Furnas, R. 325) (see also PX 79 and 80, line 10 of each). |
| | Patent '891 names stearic acid as a leafing agent (page 2, col. 1, lines 45 et seq.). Defendant uses stearic acid dissolved in mineral spirits (Furnas, R. 309–311; 318, 319; 347). Defendant insures oxygen is available by piping air into its milling operations (Furnas, R. 320, 321). |
| "* * * and removing the liquid in a non-oxidizing atmosphere at a temperature not substantially higher than about 200° C., whereby loss of the leafing film is prevented." | Defendant, in using the ball milling process to make dry leafing aluminum powder, used a vacuum drier to remove the liquid. It conducted the operation at "a temperature of 30 pounds of steam" (Furnas, R. 328). Handbooks of Chemistry and Physics shows 30 pounds of steam equals a temperature of 134.5 degrees Centigrade. The patent states vacuum drying can be used for this purpose, but when so used, the permissible temperature is lowered (page 3, col. 1, lines 53 to 58). |

Appendix "H"

(Appropriation of Claims 1, 3 and 4 of '953)

| Identical words of claims 1, 3 and 4 | Evidence |
| --- | --- |
| "The method of preparing a paste pigment of the kind described which retains its leafing properties under adverse conditions of storage and use, which consists in reducing metal particles to the form of flakes of suitable size and thickness in a liquid made up of a thinner and a leafing agent, whereby the flake surfaces are furnished with a leafing film; then treating the flake-and-liquid mixture to substantially remove therefrom the liquid and the matter, other than the metal flakes, carried therein, including impurities incidental to the flaking and leafing operations, and uncombined leafing agent, without substantial impairment of said leafing film; and thereafter mixing a relatively dry mass of the flakes so produced with fresh thinner to make a paste of desired consistency and metal content * * *" | Carrick's evidence demonstrates defendant's paste retained leafing properties over six years of storage. Evidence of Furnas shows the flakes are reduced to suitable size and thickness in a liquid made up of a thinner (mineral spirits) and a leafing agent (stearic acid) and the resultant flakes have a leafing film thereon (Furnas, R. 309 to 311; 317 to 319; 325). Furnas likewise testified the flake and liquid mixture after the reducing (ball milling) operation was then treated to remove the liquid and the matter other than metal flakes. This was done by filtering the ball mill effluent (Furnas, R. 321 to 323). The mineral spirits so removed by filtering contained the impurities and uncombined leafing agent (stearic acid) (Furnas, R. 325, 347). |
| | Thereafter, defendant mixed the filter cake, a relatively dry mass 70 per cent of which was metal, with fresh thinner to make a paste of the desired consistency (Furnas, R. 322 through 324). |
| **Further identical words of claims 1 and 3** | |
| "* * * and with a charge of fresh leafing agent constituting a definite surplus over and above the amount of leafing agent in the dry mass before the addition of the charge, whereby the paste contains a stabilization reserve of leafing agent to improve the resistance of the flakes to deterioration of their leafing properties, substantially as set forth." | Furnas testified with the fresh thinner added to the filter cake, defendant also added fresh stearic acid (Furnas, R. 324) which constituted in the final paste a surplus or reserve over that contained in the filter cake to which this fresh thinner and stearic acid was added. |

Additional words of claim 3

"The method set forth in claim 1, in which the flaking and leafing operations are conducted in a ball mill, and in which the mixture of flakes, liquid, and impurities found in the mill at the close of said operations is diluted with thinner prior to the operation of separating out the flakes."

From the evidence it was shown the flaking and leafing operations of defendant were conducted in ball mills (Furnas, R. 309 through 315). Defendant before filtering to separate out the flakes resulting from the ball milling, diluted the mixture in the ball mill with thinner (mineral spirits) (Furnas, R. 309, 322).

Additional words of claim 4 (Note: The words of claim 4 consist of those above mentioned as identical with claim 1 plus the following:)

"* * * and with a charge of fresh leafing agent amounting to about 1% of the weight of the metal, sufficient to provide a stabilization reserve of leafing agent to improve the resistance of the flakes to deterioration of their leafing properties, substantially as set forth."

Defendant after filtering the mixture to obtain a filter cake, added fresh mineral spirits and fresh leafing agent (stearic acid) (see Furnas, R. 310; 324). The amount of fresh leafing agent used by defendant was 1 per cent based on the weight of the filter cake (Furnas, R. 324). Since the filter cake contained only about 70 per cent of metal (Furnas, R. 322), the weight of fresh leafing agent was 0.7 per cent of the weight of the metal. It would appear this 0.7 per cent is covered by the words of the claim which read "* * * *amounting to about* 1% of the weight of the metal."