**VANADIUM CORP. OF AMERICA v. MARZALL.**

No. 10928.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 21, 1951.

Decided May 8, 1952.

William H. Webb, Pittsburgh, Pa., of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court, with

38. 60 Stat. 839, 840, 841–2, 2 U.S.C.A. §§ 264, 267.

whom Donald A. Gardiner, Washington, D. C., and Bruce G. Mackey, Pittsburgh, Pa., were on the brief, for appellant.

S. William Cochran, United States Patent Office, Washington, D. C., with whom E. L. Reynolds, Solicitor, United States Patent Office, Washington, D. C., was on the brief, for appellee. .

Before PRETTYMAN, FAHY and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a suit under R.S. § 4915, 35 U.S. C.A. § 63, seeking to patent a process for the manufacture of the metal manganese by electrolysis. To the established initial steps of the standard processes for producing the electrolytic solution, as disclosed in the patent to Hannay, et al., No. 2,259,418, and in a Bureau of Mines bulletin described as Report of Investigation No. 3406, plaintiff-appellant would add a final step. This involves the addition of iron, usually as ferrous sulphate, to the solution resulting from the initial stages of the standard processes, for purposes of further purification. Under the Bureau of Mines process, ferrous sulphate was added to the solution at a preceding stage, for the purpose of precipitating any arsenic present. Plaintiff-appellant's process thus involves the use of ferrous sulphate at two separate stages.

The question presented is whether the addition of the final step in the process amounts to patentable invention. According to the testimony of Mr. Woodman, one of the original applicants,[1] electrolysis of the solution produced by the standard processes was commonly or at least frequently unsuccessful. No one in the industry knew the precise cause of the difficulty, but it was assumed to be due to some sort of impurity. In their specification the applicants state that "We have not been able to establish the exact mechanism by which these impurities are removed, nor have we been able to identify even qualitatively the nature of the impurities." But the process they discovered evidently removes the deleterious matter; it is a commercial success and a conceded improvement over past methods.

Appellant contends that nothing in the prior art pointed to a repetition of the ferrous sulphate treatment as a final step in the purification. Appellant says that after others had wrestled for years with a difficulty of unknown origin, its chemists came up with a successful answer. "While it is true that invention may be the result of accident, and one seeking a patent thereon need not understand or be able to state the scientific principles underlying his claim, nevertheless, he is charged with knowledge of the state of the art * * *." L. Sonneborn Sons, Inc. v. Coe, 70 App.D.C. 97, 98, 104 F.2d 230, 231. In their specification the applicants say that it was common knowledge that the minutest quantities of metallic impurities "will lower or prevent cathodic deposition of manganese."[2] No way was found of detecting the nature of the impurities in the standard solutions or of determining in what form they were present. But according to both the specification and the testimony, the applicants suspected that these solutions might contain tiny residues of free sulphur and metal sulphides, the sulphides being formed during the last step of the standard process.

The specification further says that "The tendency of metal sulphides to form colloids is well known * * *." Although Mr. Woodman testified he believed that the impurities were not colloidal in form because they appeared to survive the most careful filtration, the specification notes the possibility that the function of the invention was the removal of colloids.[3] With the

1. The applicants assigned to plaintiff-appellant.

2. Mr. Woodman testified that "an electrolytic cell is so sensitive, so sensitive to impurities, even impurities that the laboratory themselves cannot detect, that it will ruin deposition, it will ruin deposition entirely. We did not know at that time everything that was causing our trouble." Jt.App. 52.

3. "The tendency of metal sulphides to form colloids is well known and free sulphur may be postulated as present in the solutions. It is possible that the function of the treatment step which we employ may be the removal of such solids, probably in the form of microscopic particles." Specification, Jt.App. 77. See also Mr. Woodman's testimony. Jt. App. 57–58.

possibility in mind that sulphide colloids might be present and the knowledge that such impurities would have a deleterious effect on electrolysis, what would a skilled industrial chemist have tried? According to the specification, "There are many instances referred to in the technical literature where solids [colloids] have been absorbed by iron hydroxides [4] and it appears that traces of impurities may be removed by this mechanism."

We must weigh, in the light of these facts, appellant's contention that nothing in the prior art suggested the final ferrous sulphate treatment. While the matter is no doubt debatable, we think a reasonable mind could fairly conclude that this treatment was one which those skilled in the art would sooner or later have tried.[5] Industrial chemistry is a science which to a large extent proceeds by empirical experimentation. "Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places." Atlantic Works v. Brady, 1882, 107 U.S. 192, 199, 2 S.Ct. 225, 231, 27 L.Ed. 438. We do not say that the ferrous sulphate treatment would necessarily appear to be the obvious answer to the problem confronting the applicants, but simply that it would logically suggest itself as one of the possibilities calling for investigation as part of an intelligent experimental program seeking a purer electrolytic solution. Cf. L. Sonneborn Sons, Inc. v. Coe, supra; General Motors Corp. v. Preferred Electric & Wire Corp., 2 Cir., 109 F.2d 615. The District Court was thus not clearly in error when it concluded that the testing out of this possibility did not represent a "flash of genius," and hence was not inventive. Standard Oil Development Co. v. Marzall, 86 U.S.App.D.C. 210,

181 F.2d 280. Consequently, its judgment must be

Affirmed.

4. The ferrous sulphate is oxidized and converted into ferric hydroxide in the solution. Jt.App. 57; Pl.Ex. 6, Jt.App. 127.

5. The District Court in effect so found. In addition to what we have noted above, the District Court found that the presence of residual arsenic was or should have been considered as a possible in-

hibitor of electrolysis, that treatment with ferrous sulphate to remove arsenic was old in the art, constituting in fact the first step in the standard purification process, and that consequently the additional ferrous sulphate treatment was indicated on this ground as well. Findings of Fact Nos. 10 and 11.