**METALS DISINTEGRATING COMPANY, Inc.**

v.

**REYNOLDS METALS COMPANY,**
Appellant.

No. 11631.

United States Court of Appeals
Third Circuit.

Argued Nov. 3, 1955.

Decided Jan. 13, 1956.

Elmer M. Cunningham, Richmond, Va. (Walter L. Rice, Donald L. Rose, William H. Hogeland, Jr., Richmond, Va., James R. Morford, William H. Bennethum, Wilmington, Del., on the brief), for appellant.

W. D. Keith, New York City (Arthur G. Connolly, Wilmington, Del., Paul S. Bolger, New York City, on the brief), for plaintiff.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is an action for infringement of two patents, No. 2,002,891 and No. 2,-144,953, both used in the manufacture of aluminum paints. The District Court held both valid and found infringement of each from the date plaintiff purged itself of their prior misuse. D.C.D.Del. 1955, 130 F.Supp. 227. Appellant, contending that both patents are invalid for lack of invention, does not contest the claim of infringement if they are valid, but argues that, in any event, the District Court erred in fixing the date when purge was effected.

The setting of the controversy is this. The basic components of metallic paints are a liquid paint vehicle and a pigment in the form of finely divided metal particles. Much of today's aluminum paint is made by mixing a leafing aluminum bronze paste with an ordinary paint vehicle such as varnish. "Bronze" as used here is neither a metal nor a color, but rather the form of small flakelike particles to which certain metals, and particularly aluminum, can be and are reduced for various commercial uses. Thus, aluminum bronze is aluminum in tiny flaked particles. "Leafing" or "mir-

roring" is a property which bronzed particles may be caused to exhibit in such liquids as oils and varnishes. It is the property of rising to the surface of the liquid and there dispersing yet overlapping to form a thin continuous metallic film. This extraordinary behavior must be artificially induced, particularly since the metal is specifically heavier than the liquid vehicle. It is important in metallic paint because it increases opacity, coverage and brilliance of finish.

In this connection it should be noted that two distinct problems are involved in the art of making aluminum pigment. First, a quantity of aluminum must be reduced to the bronze form. Second, a satisfactory leafing quality must be imparted to the bronze. Before the inventor Everett Hall devised the process described in Patent No. 2,002,891, hereinafter called Hall '891, it was the teaching and practice in this field that these two essentials be accomplished in separate stages. In the first stage a milling operation reduced the metal to bronze. There followed a separate process of "polishing" the flakelike particles with a leafing agent, often stearic acid, and "aging" these treated particles. According to the evidence in this case and the proper findings of the District Court, thereon, this polishing and aging was the commercially accepted method of inducing leafing until Hall devised the process here in question.

The new teaching of Hall '891 was a method of reducing and processing the metal in a single stage to produce a leafing paste which was more satisfactory to handle than the familiar leafing powder and made a better paint. More particularly, Hall '891 taught that where aluminum, while being reduced by impact in a ball mill, is treated with approximately 3 per cent of its weight of stearic acid in a volatile liquid like paint thinner in the presence of oxygen and heat, a satisfactory leafing quality will be imparted to the bronze; that evaporation of the excess liquid at a temperature not more than 50° C. will leave a homogeneous, stable paste which is a satisfactory leafing pigment; and, if a leafing powder is desired, this may be accomplished by further evaporation at the indicated temperature.

It is agreed that invention inheres in the discovery and devising of such an advanced process for making a superior pigment. But, it is argued against the patent in suit that in an earlier patent Hall had revealed and described essentially the same process, although he may not have realized its full significance at that time. Therefore, it is contended that the monopoly which is being asserted by Hall's assignee in this case cannot be extended beyond the life of the earlier patent, which had expired before the presently alleged infringement. Thus, the matter in dispute here is essentially the relationship between the patent in suit and an earlier Hall patent, No. 1,-569,484, hereinafter called Hall '484.

On its face Hall '484 was concerned only with an improved solution of the problems involved in the disintegration of metals into flakes or powders. In other words, bronzing alone rather than leafing or any combination of bronzing and leafing is the problem to which this invention addresses itself. Indeed, the evidence shows that this patent was employed industrially in the reducing of metals for use in making fireworks, other incendiary preparations and chemicals rather than in paint making. What Hall '484 disclosed was a wet ball milling process for disintegrating metals. It taught the placing of the metal in a ball mill and so revolving the structure as to subject the metal to the hammering action of ball against ball and ball against mill wall. At the same time, to facilitate such reduction, prevent aggregation of particles, and reduce the hazards of oxidation and explosion, Hall taught that during the milling process the metal should be covered with a lubricating agent. When disintegration was completed the liquid contents of the mill were evaporated to produce a flakelike powder.

Color is lent to the claim that Hall '484 anticipates and teaches the alleged later

disclosures of Hall '891 by these additional facts. The lubricant proposed by Hall '484 was a petroleum oil with a small amount of stearic acid added. The end product of that milling process, although a so-called "dry" powder, was in fact greasy with a residual coating of stearic acid. Admittedly, stearic acid is the basic leafing agent in the process taught by Hall '891. Thus, it is argued that, whether Hall realized it or not, his earlier patent taught a way of making a leafing pigment essentially no different from what he claimed later as a distinct invention in Hall '891.

We agree with the District Court that this position is not well taken. We start with the undisputed, though inconclusive, fact that the wet ball milling process of Hall '484 was not conceived or intended to produce a leafing metallic pigment. However, beyond such intendment the critical question of fact is whether that process, essentially unchanged, was afterwards utilized in Hall '891 to produce a leafing pigment.

The District Court found as a fact that efforts had been made without success to make a leafing pigment by the process described in Hall '484. Recognizing the importance of this finding appellant says it is based upon misinterpretation of the evidence. We have examined the testimony and think that it supports the finding.

But, however that may be, appellant also argues that once stearic acid is recognized as an effective leafing agent it necessarily follows that Hall '484 produced a leafing bronze, since that patent taught the exposure of the disintegrating aluminum to stearic acid in the reducing mill and the process yielded as an end product flakes to which a greasy film of stearic acid still adhered. But the evidence does not support the premise that contact between aluminum flakes and stearic acid automatically results in a leafing pigment. Indeed, the record shows that experience in the practice of the art was just to the contrary. For, although the use of stearic acid as a lubricant was familiar practice in the re-

duction of metals before Hall, it had been found necessary to add polishing and aging steps in order to produce a leafing pigment.

Moreover, the very teaching of Hall '891 which marks it as inventive points to that which is essential to induce satisfactory leafing but had not been taught or covered by any prior art. In that patent it is disclosed for the first time that both heat and oxygen are essential to induce the reaction between stearic acid and aluminum flakes which enables the metallic particles to leaf in the desired manner. And a process is taught which effectively employs and interrelates these essential factors. In contrast Hall '484 taught the continual cooling of the operating mill or the exclusion of oxygen from it, or both, as desirable safety measures which were consistent with and actually facilitated the disclosed process. Moreover, Hall '891 discloses that about ten times as much stearic acid must be used to sustain the leafing process as Hall '484 required for lubrication. Indeed, Hall '891 goes further and explains that this large amount of stearic acid is necessary because in the disintegrating process the stearic acid which attaches itself to the metallic particles is repeatedly dislodged by the hammering action. And once dislodged it does not have further value as a leafing agent. For this reason fresh stearic acid must be present continually to join and react with the metallic particles as they become denuded in the hammering process.

■ We think the District Court was correct in viewing these new discoveries and disclosures of the utilization of heat, oxygen and excess stearic acid for leafing while bronzing as significant indicia of invention. The total picture as we see it is one of a process differing sufficiently, both in essential procedures and end result, from anything already known and disclosed, to refute the claim of anticipation by Hall '484 and to warrant the District Court's conclusion that the inventor's new devisings as embodied in Hall '891 constituted invention.

The second patent in suit is No. 2,144,-953 covering an improvement of Hall '891, as devised by Otho Ziehl, one of the present plaintiff's employees. After several years' experience in making and marketing the Hall paste pigment, plaintiff found that the leafing characteristic of the product occasionally was lost under certain unusual circumstances. Either the carelessness of workmen in handling unsealed containers or the subjecting of pigment to excessive temperatures in shipping or storage would at times cause such deterioration. To solve this problem Ziehl undertook to make the Hall paste more stable, and obtained a patent for this stabilizing process.

Hall '891 had taught that "the material taken from the mill, with the removal of part of the liquid, is a finished paste product without further treatment." Hall added: "A typical product in paste form contains 58% aluminum; 1% stearic acid; 1% aluminum stearate, which as stated helps the grinding action and also helps in the production and maintenance of the homogeneous paste form; and 40% of a petroleum fraction, such as 'Varnolene'." Thus, the Hall practice was to remove only part of the liquid in reducing the content of the mill to a paste. Ziehl's modification was to filter off substantially all of the liquid fraction and then to reconstitute a paste by mechanically adding fresh liquid. This fresh liquid did not differ in kind from that which had been removed by filtration although its stearic acid content, 1% of the weight of the metallic fraction, was higher than the stearic acid content of the liquid removed by filtration. This excess of fresh stearic acid, in the words of Ziehl's patent, "appears to act as a stabilization reserve." Ziehl further indicated the nature of his invention by the following illustration: "The improvement effected by the invention is well illustrated by adjusting a filter cake containing 78% aluminum to form a 65% paste by mixing it with (a) fresh thinner and (b) thinner containing stearic acid in solution in an amount equal to about 1% based on metal and permitting the two pastes to dry slowly by placing them in cans having perforated lids covered with a cloth. The two pastes initially have substantially identical leafing abilities (75%). Under these exceptional conditions while the leafing ability of (a) is dropping to 36% that of (b) is maintained."

Thus, all Ziehl taught was a mechanical substitution of fresh liquid with higher stearic acid content for the liquid fraction of Hall's paste. Had there been no change in the proportion of stearic acid, certainly the replacement of a liquid fraction by like fresh liquid would not be inventive. It is a procedure which would occur to anyone whenever the Hall paste should become drier than desired. Nor does the increase in the proportion of stearic acid in the replacing liquid help the claim of invention. For, the utility of stearic acid in inducing and improving the leafing property is familiar learning. And the Hall process which Ziehl undertook to improve itself emphasizes both the desirability of excess fresh stearic acid in the leafing agent and the stabilizing effect of the derivative aluminum stearate in the paste itself. Ziehl's contribution was the idea that the advantages thus pointed out might be achieved in greater degree by substituting fresh stearic acid at the very end of the paste making process. And his method of accomplishing this was the most elementary mechanics. In our view neither the conception nor the manner of its execution constituted an inventive modification of Hall '891. This conclusion is supported by a similar holding in a rather analogous case recently decided by the Court of Appeals for the District of Columbia. Vanadium Corp. of America v. Marzall, 1952, 91 U.S.App. D.C. 3, 197 F.2d 187.

The District Court [130 F.Supp. 239] gave no indication of the basis of its conclusion that this patent is valid except to say that the patent "is entitled to presumption of validity." However, we think this presumption cannot stand in the face of analysis of Ziehl's claim in relation to the teachings of Hall and the:

skill reasonably to be expected of a practitioner in applying and adapting the teachings and practices of his art.

■ Appellant's final contention is that the District Court erred in fixing the date when plaintiff's misuse of Hall '891 ended. Of course, a patentee who has abused the privilege conferred by the grant of a patent cannot enforce it against an infringer until it has terminated the improper use and dissipated the consequences thereof. Mercoid Corp. v. Mid-Continent Investment Co., 1943, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. In this case plaintiff misused its patents by entering into an illegal price fixing contract with defendant and a third party on November 29, 1939. About November 1, 1946 defendant notified plaintiff that it considered the arrangement illegal. Plaintiff thereupon sought to get defendant's agreement to remove the illegal clauses. When defendant refused, plaintiff took no further action under nor made any demand based upon the agreement and defendant ceased all performance thereunder.

■■ On April 2, 1947 plaintiff formally agreed with its only other licensee to abrogate in its entirety a similar agreement. On October 14, 1948 the District Court declared the agreement between plaintiff and defendant null and void as against public policy. The court below found as a fact that misuse as regards defendant ceased about November, 1946 and all misuse terminated by April 2, 1947. Defendant argues that in law its contract with plaintiff was a misuse which continued to the date it was declared illegal by the District Court although the agreement was never enforced after November, 1946. The short answer to defendant's contention is that in legal contemplation its contract with plaintiff, being contrary to public policy, was never valid. Licznerski v. United States, 3 Cir. 1950, 180 F.2d 862, certiorari denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389. The significant question is factual. When did all performance under this agreement cease? Since plaintiff did not seek to enforce the bargain

after November, 1946 it was not guilty of any misuse with respect to defendant thereafter. This conclusion is reenforced by the fact that plaintiff unsuccessfully sought defendant's agreement to formal elimination of the illegal provisions. Thus, but for defendant's intransigence, there would not even be colorable basis for its present contention.

We accordingly agree that purge as regards defendant was complete in November, 1946 and all illegal use terminated by April 2, 1947. Therefore, damages may properly be computed from the latter date.

The judgment of the District Court will be affirmed insofar as it relates to Patent No. 2,002,891 and reversed in so far as it relates to Patent No. 2,144,953. In these circumstances each party will be required to bear its own costs on this appeal.