**TINNERMAN PRODUCTS, INC.,**
Plaintiff,

v.

**GEORGE K. GARRETT COMPANY, Inc.,**
Defendant.

Civ. A. No. 18190.

United States District Court
E. D. Pennsylvania.

June 27, 1960.

Albert R. Teare, Cleveland, Ohio, and Virgil E. Woodcock, Philadelphia, Pa., for plaintiff.

Leonard L. Kalish, Philadelphia, Pa., for defendant.

GRIM, District Judge.

This is an action for infringement of three United States patents, Nos. 2,221,-498, 2,233,230, and 2,581,481, owned by plaintiff and covering nuts or fasteners made of sheet metal. Trial was had before the court without a jury, and the

matter has been argued. Defendant admits infringement of the second and third patents, but denies the validity of all three for want of invention. Defendant further contends that all three patents are unenforceable because of misuse, contrary to the antitrust laws.

Plaintiff's predecessor corporation manufactured kitchen stoves. The enameled stove panels were fastened together with a standard bolt and nut, the nut being solid and of an appreciable thickness compared with the diameter of the bolt, thick enough to contain several threads which engaged the thread of the bolt. It was found that the tightening of the nut sufficiently to hold the panels firmly caused the enamel to crack during the expansion and contraction of the panels incident to heating and cooling in the use of the stoves.

Plaintiff solved this problem by inventing a new kind of nut,[1] made of sheet metal. A square or diamond-shaped hole was punched out of the center of a small rectangular piece of sheet metal, with the sides of the hole at an angle of about 45° to the sides of the piece. Then two cuts, shorter than the long dimension of the piece, were made in the piece, parallel with its longer sides, the cuts intersecting at their midpoints the two corners of the hole closest to the sides of the piece. This created two flat tongues in the piece, opposite each other, each containing a V-shaped notch. The notched inner ends of the tongues, being free, were then raised and canted somewhat, to engage the threads of a bolt inserted perpendicularly into the hole.

This nut had the virtue of holding the panels together under spring tension. It allowed sufficient movement of the panels to avoid cracking of the enamel, but still held them tightly together whether hot or cold. It also eliminated the need for lock washers which had previously been used to prevent loosening of the bolt from vibration.

The patents in suit are for improvements on the original invention.

It was found in use that the original invention was lacking in strength and hence could not be used satisfactorily where any great degree of tension was required. Excess tightening of the bolt, by hand or with power tools, would simply pull the tongues through the nut, as a result of which the nut would no longer hold. Attempts to strengthen the nut by making it out of heavier sheet metal or by shortening the tongues proved impractical. There was also some loosening from vibration.

Plaintiff then obtained the first patent in suit, No. 2,221,498, for an improvement on the original invention. This consisted of adding strength[2] to the tongues by curving them and improving the locking quality of the tongues by changing the shape of the hole from a square or diamond to a generally circular shape. The added strength allowed the bolt to be turned more tightly and also permitted misaligned panels to be brought together to proper position merely by tightening the bolt. The change in the shape of the hole improved the locking quality of the tongues by providing engagement with the bolt thread almost continuously around it, rather than at only four points as before. The curving of the tongue is described in the claim of the patent as "a substantially longitudinal corrugation extending throughout the width thereof and providing its intermediate length portion with a generally concave, transverse cross-section."

Plaintiff then developed an improvement[3] on the nut of the first patent in suit, which consisted of using a relatively longer piece of sheet metal, placing the tongues and hole near one end of the piece, and doubling the uncut end underneath so that its end came opposite the

1. Patent No. 1,512,653, not in issue in this action.

2. Plaintiff here has elected to rely only on Claim 7 of the '498 patent.

3. Covered by Patent 2,101,287, a patent not in issue in this action.

end of the upper portion. From the side the nut had somewhat the appearance of an elongated letter "U", and hence it came to be called a "U-nut." An additional feature of the U-nut was the punching, in the lower leg of the U, beneath the hole in the upper leg, of a circular hole with a raised edge.

There were a number of advantages to the U-nut. Where a bolt hole was near the edge of the panel, the nut could be slipped over the edge (with one leg on each side of the panel) and the bolt could be inserted and tightened even when the opposite surface of the panel was inaccessible, obviating the necessity for access to the opposite side to hold the bolt. The raised edge around the circular hole in the lower leg made it easy to place the nut in line with the bolt hole in the panel without close examination, since the raised edge would tend to snap into the bolt hole when the nut was in proper position. This had the additional advantage of holding the nut in place when the panel was transported from one place to another during manufacture, prior to insertion of the bolt.

The second patent in suit, No. 2,233,230, is for a sheet metal nut similar to the U-nut.[4] The principal distinguishing feature is that the lower leg is only about half the length of the upper and extends only to a point opposite the edge of the circular hole in the upper leg. The nut looks from the side like a J and is therefore known as a "J-nut." The end of the short leg is turned up in the center so as to slip into the bolt hole in the panel a short distance, constituting a means for easily finding the bolt hole and holding the nut in its proper position. The turned-up part is sometimes called a "detent." It leaves ample space for insertion of the bolt.

One advantage gained from the J-nut over the U-nut was a saving of material in making it. A second advantage was that the shortening of the lower leg made

the bolt hole in the panel visible. Another advantage was that one size of nut (referring to the size of the opening between the upper and lower legs) will fit panels of more than one thickness. A fourth advantage was that the nut could be put on the panel without the necessity of first holding its legs parallel to the plane of the panel. The nut can easily be rotated into place by holding the shorter leg at an angle to the plane of the panel and then rocking the nut until the longer leg is parallel with the panel's surface. This has the effect of largely eliminating any marring of the panel surface which might normally occur in applying the nut. A fifth advantage was that it was not necessary to emboss the edge of a panel to provide flush mounting between two panels, as in the case with the U-nut.

The third patent in suit, No. 2,581,481, which can be either a U-nut or J-nut, is for a sheet metal nut doubled over like the U-nut, but differing in that the portion containing the two tongues is largely severed from the rest of the nut by two cuts parallel to the sides of the nut, is connected to the upper leg only at the end away from the bend (the loop of the U), and is free at the end next to the bend.[5] The nut is comparatively wider than the previously described U-nut, the additional metal at each side of the tongues being used to form the loop of the U. The portion containing the tongues, connected with the rest of the nut at only one end, is referred to as a "spring arm", and is bent slightly downward into the gap between the arms. The spring arm increases the range of panel thicknesses on which one size (gap distance) of nut can be used, and also has the effect of keeping itself parallel to the panel, so that regardless of the thickness of the panel, the tongues are always in proper position to receive a bolt inserted perpendicularly to the panel. The existence of tension in the spring arm puts pressure on the self-indexing lip and makes it function more

---

4. Plaintiff has elected to rely only on Claim 3 of this second patent in suit.

5. This patent has only one claim.

effectively in locating the bolt hole in the panel and then holding the nut in place.

The statute provides in Section 282, 35 U.S.C.A. § 282:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it. * * *"

The burden of proof of invalidity, therefore, rests on the defendant.

The statute [6] provides that "whoever invents or discovers any new and useful * * * machine * * *, or any new and useful improvement thereof, may obtain a patent therefor * * *" This establishes invention,[7] novelty, and utility as the standards of what may be patented. Of these standards the most difficult to apply is invention.[8]

Some assistance has been given, however, by the formulation of certain objective tests [9] which may be applied in cases of doubt. Among these are the tests of long-felt want, utility, economy, efficiency, prompt and general adoption and recognition of the validity of the patent.

### Patent No. 2,221,498.

It is clear that the first patent in suit, by providing stronger tongues and changing from a flat-sided to a round hole, supplied a long-felt-want—especially in the automotive industry—for a nut that would stand up under greater tightening of the bolt, would permit alignment of parts by bolting, and would resist far better the tendency to loosen the grip of the bolt under vibration. Prompt and general adoption of the nut is evident from the record of sales from 1947 [10] to 1957 [11].

All these facts likewise establish clearly the utility and efficiency of the nut.

While the objective tests of invention are helpful, "in the final analysis, determination of invention is a matter of judgment—which is itself a word difficult to define, or prescribe by limits or boundaries. It can safely be said, however, that the judgment is a product of the reasoning faculties of the human mind, compounded of and conditioned by experience in human affairs and (in the case of a judicial officer) the requirements, exigencies and training of legal and judicial work. And the subjective personal factor—personal in the sense that judgment to some extent varies with the individual—is not negligible. Thus it was said by Judge Hand in Kirsch Mfg. Co. v. Gould Mersereau Co., Inc., 2 Cir., 6 F.2d 793, 794: 'Objective tests may be of value vaguely to give us sense of direction, but the final decision can be only loosely indicated. An invention is a new display of ingenuity beyond the compass of the routineer, and in the end that is all that can be said about it. Courts cannot avoid the duty of divining as best they can what the day to day capacity of the ordinary artisan will produce. * * * Yet, when all is said there will remain cases when we can only fall back upon such good sense as we may have, and in these we cannot help exposing the inventor to the hazard inherent in hypostatizing such modifications in the existing arts as are within the limited imagination of the journeyman. There comes a point when the question must be resolved by a subjective opinion as to what

6. 35 U.S.C.A. § 101.

7. "The term 'invention' means invention or discovery," 35 U.S.C.A. § 100(a).

8. R. M. Palmer Co. v. Luden's Inc., 3 Cir., 1956, 236 F.2d 496, 498.

9. Walker on Patents, Deller's edition, § 25.

10. The patent was granted in 1940, but records for years prior to 1947 are not available.

11.

| | Number of Pieces | Sales |
|---|---|---|
| 1947 | 494,384,462 | $2,118,248 |
| 1948 | 598,175,045 | 3,040,822 |
| 1949 | 597,984,866 | 3,147,693 |
| 1950 | 1,058,628,428 | 5,475,796 |
| 1951 | 859,358,512 | 5,368,429 |
| 1952 | 778,473,895 | 4,891,759 |
| 1953 | 947,751,003 | 6,061,378 |
| 1954 | 786,593,201 | 4,982,755 |
| 1955 | 1,001,605,022 | 6,585,731 |
| 1956 | 782,478,396 | 5,495,619 |
| 1957 | 680,463,123 | 4,957,988 |

seems an easy step and what does not.' * * * " [12]

Defendant contends that the first patent is invalid for the reason that its two elements (strengthened tongues and change in the shape of the hole) were anticipated by prior patents and were, in the words of Section 103 of the statute, 35 U.S.C.A. § 103, setting forth conditions for patentability, "obvious at the time the invention was made to a person having ordinary skill in the art."

Defendant contends that the use of cross-curvature, the corrugation, to strengthen the tongues of the first patent is merely the application of an old and well-known means of imparting strength to sheet metal which, because it is thin, is usually lacking in the strength necessary to resist even a small amount of force applied in a direction generally perpendicular to the plane of the sheet.

 The combination of old and familiar elements constitutes invention only when the result produced is one that is surprising or unexpected, i. e., when the whole is greater than the sum of its parts.[13]

The result claimed for applying cross-curvature to the tongue is an increase in the strength of the tongue. This result is exactly what is to be expected from applying curvature to a piece of sheet metal, and is a result neither surprising nor unexpected since it has been applied in other and earlier situations such as corrugated metal roofs. The results claimed for strengthening the tongue are (1) greater resistance when the bolt is tightened and (2) the ability to pull "misaligned" panels into alignment. These results are both unsurprising and to be expected from an increase in the strength of the tongue.

The result claimed for the other aspect of the '498 patent—the change from a square or diamond-shaped hole to a generally round one—is a greater area of contact between the hole and the thread of the bolt. The increase in contact area between two bodies by changing the shape of one to coincide more closely with the shape of the other is certainly expected and free of surprise. This increase in the area of contact between the two bodies necessarily increases the number of points at which friction between the two bodies can take place, and where friction between them is increased there is likely to be greater resistance to movement between them. Greater friction between bolt and nut leads to the result that they are less likely to disengage in consequence of vibration. Herein likewise there is nothing surprising or unexpected in the result.

Taking these two aspects together we have a nut that has greater strength and greater resistance to loosening, the very same results that flow from each aspect separately. There is no additional unexpected or surprising result that comes from the combination of the two.

Plaintiff contends that the locking effect of the nut comes not so much from the increased friction as from the "digging-in" of the tongues into the threads of the bolt when the bolt is tightened. The early Tinnerman patent (No. 1,512,-653), wherein invention is clearly evident, produced the same digging-in effect, but for lack of strength, produced the effect to a far less degree. The digging-in effect of the first patent in suit is improved because the tongues are stronger and because the area of contact is increased.

 I find, therefore, that the first patent in suit, No. 2,221,498, is invalid for lack of invention. Since it is invalid, the issue of infringement need not be considered.

A nut which will hold firm despite vibration is an extremely useful article, but

12. Kalodner, J., in West Branch Novelty Co. v. Bloom, D.C.E.D.Pa.1940, 31 F. Supp. 673, 680.

13. Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Weller Manufacturing Co. v. Wen Products, Inc., 7 Cir., 1956, 231 F.2d· 795, 798.

the idea of it is not protected by the '498 patent because it is implicit in the earlier patent, No. 1,512,653, and for that reason does not constitute invention.

### Patent No. 2,233,230.

The second patent in suit, for the J-nut, likewise fulfilled a long-felt want and enjoyed prompt and general adoption.[14] It was markedly useful and efficient in ease of application (by "rocking" it on the panel), in self-indexing, in being available for use on panels of different thickness, and in leaving visible the bolt hole in the panel. Efficiency in manufacture resulted from a lessening of the amount of material required to make the nut and from the fact that a smaller number of sizes was required to fit any given range of panel thicknesses.[15]

It appears that there have been three asserted infringements of the J-nut patent. The first was asserted in an action by plaintiff against Detroit Harvester Company in the Eastern District of Michigan.[16] This case was settled by a license to the defendant therein, which agreed to pay royalties. That license was subsequently assigned to Prestole Corporation, which later ceased to pay royalties but continued to manufacture nuts. Plaintiff brought suit for infringement against Prestole in the Northern District of Ohio, Western Division.[17] While a master's report has been filed, exceptions thereto are pending and the issue of infringement in that suit remains undetermined. The third alleged infringement is that charged in the suit at bar.

Defendant here contends that the J-nut patent is invalid because it involves nothing more than the cutting off of half of the lower leg of the U-nut, the obvious and foreseeable effect of which is to render the bolt hole in the panel more visible and to lessen the amount of material required to make the nut. These two effects are clearly to be expected from shortening one leg of a U-nut.

The shortening of the leg had one effect, however, which in my opinion was surprising and unexpected, and which would not have been foreseen by one skilled in the art. That effect was that application of the nut to the panel was greatly facilitated (and at the same time there was less likelihood of marring the surface of the panel) because the nut could be rocked on to the panel from an angle, rather than having to be held almost parallel to the panel. In this I find invention.

I find, therefore, that patent No. 2,233,230 is valid. Infringement is admitted.

### Patent No. 2,581,481.

The third patent in suit, while recent,[18] has enjoyed a measure of success.[19] I cannot say that it answered a long-felt want to the degree that the first and second patents in suit did. The '481 patent is for a nut which is both useful and efficient in that the spring-arm allows the use of a single size of nut on a larger range of panel sizes than the J-nut. It is useful in holding the bolt perpendicular to the plane of the panel. The spring-

14.

| | Number of Pieces | Sales |
| --- | --- | --- |
| 1947 | 74,315,773 | $ 385,446 |
| 1948 | 95,827,182 | 595,530 |
| 1949 | 165,434,740 | 902,419 |
| 1950 | 220,348,766 | 1,145,174 |
| 1951 | 163,602,416 | 952,432 |
| 1952 | 151,397,408 | 941,963 |
| 1953 | 187,036,296 | 1,410,929 |
| 1954 | 172,314,223 | 1,476,300 |
| 1955 | 224,099,381 | 1,824,453 |
| 1956 | 145,785,859 | 1,203,380 |
| 1957 | 167,408,295 | 1,617,254 |

15. While it is claimed that the J-nut has the advantage that it will not clog with paint, because of its single thread, it ap-

pears that this advantage would occur in any single-thread nut, including all plaintiff's prior patents mentioned in this opinion.

16. Civil Actions 1492 and 2563.

17. Civil Action 7251.

18. Patented January 8, 1952. First sales of the nut of this patent were made in 1954.

19.

| | Number of Pieces | Sales |
| --- | --- | --- |
| 1954 | 9,004,416 | $33,949 |
| 1955 | 6,169,600 | 24,168 |
| 1956 | 5,432,000 | 23,490 |
| 1957 | 6,135,552 | 29,002 |

arm is useful and efficient in holding the nut more firmly to the panel before bolting, so that when the panel is moved during an assembly operation, the nut will be in its place, rather than absent and requiring replacement—a process which can disrupt the orderly functioning of modern assembly lines and consequently reduce their efficiency. The only alleged infringement of the '481 patent is that charged in the suit at bar.

Defendant contends that this patent is invalid for the reason that its salient feature is the spring-arm, which is old, and that there is no invention in applying a spring-arm to a sheet metal nut. To support this contention defendant asserts that the '481 patent is anticipated by Kost patents Nos. 2,230,355 and 2,255,469, both of which show the use of spring-arm on a sheet metal nut. In fact, a spring-arm is used on each of these nuts. In the '355 patent, the spring-arm is cut out of the upper leg of the nut so as to contain the thread-engaging part[20] of the nut, with the free end of the spring-arm toward the bend of the nut. In the '355 patent a V-shaped tongue is pressed down out of the thread-engaging part, with the point toward the bend of the nut. The tongue is intended to drop into the bolt hole in the panel (the hole being considerably larger than the bolt) in order to facilitate proper placing of the nut with reference to the bolt hole and to hold the nut in position once it has been properly placed.

The only genuine difference between the '355 patent and the '481 patent is that the positioning or self-indexing element of the '355 patent is on the leg containing the thread engaging part and that the self-indexing element of the '481 patent is on the opposite leg.

■ I find, therefore, that the '481 patent is anticipated by the '355 patent and is therefore invalid. For this reason it is not necessary to consider defendant's contention with regard to the Kost '469 patent.

### Misuse.

Since patent No. 2,233,230 is valid and infringed, it is necessary to consider defendant's contention that plaintiff's misuse of that patent, in violation of the antitrust laws, disentitles plaintiff to relief, despite the patent's validity and defendant's admitted infringement of it. Defendant charges that plaintiff entered into licensing agreements which (1) prohibit the licensee from making or selling devices which are the subject matter of expired patents or patents expiring prior to the term of the agreement, and (2) fix prices at which the licensee may sell the device.

■ The principle underlying this contention of defendant is stated in United States Gypsum Co. v. National Gypsum Co., 1957, 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465:

> "It is now, of course, familiar law that the courts will not aid a patent owner who has misused his patents to recover any of their emoluments accruing during the period of misuse or thereafter until the effects of such misuse have been dissipated, or 'purged' as the conventional saying goes."

On August 18, 1942, plaintiff granted Detroit Harvester Company a license[21] to make and sell fasteners covered by several patents, including the '230 patent. The license agreement included a restrictive provision which, defendant contends, constituted misuse by prohibiting the licensee from making or selling certain fasteners covered by certain expired patents. In plaintiff's action against Detroit Harvester's assignee, Prestole Corporation, for specific performance of the license agreement it was held on appeal that this provision constituted misuse of the patent, Prestole Corporation v. Tinnerman Products, Inc., 6 Cir., 1959, 271

---

**20.** The patent says that this part "may be any one of several forms without departing from the spirit of the invention." Patent, p. 1, left column, lines 51–53.

**21.** Detroit Harvester also cross-licensed plaintiff on the same date to make fasteners under Detroit's patents.

F.2d 146, certiorari denied 1960, 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545. While this determination is not res judicata of the case at bar (the present defendant not having been a party to that litigation) the evidence here points to the same result. I accept the decision of the Sixth Circuit, therefore, as sound and determinative of the issue of misuse of the patent through that agreement.

The license agreement with Prestole was cancelled, however, on April 23, 1954, and since it was only by virtue of the license that Prestole was entitled to manufacture the patented products, performance must have ceased at or about that time. The record in this case does not contain evidence to the contrary. Plaintiff therefore purged itself of this misuse at that time and is not bound by this misuse from recovering for infringement which occurred thereafter.[22]

There remains defendant's contention that plaintiff's action is barred by misuse of the patent by price-fixing provisions in license agreements with Mount Clemens Metal Products Company and Illinois Tool Works, both covering the '230 patent.

The Mount Clemens agreement, dated April 25, 1941, contains the following provision:

> "4. Tinnerman shall have the right to fix minimum prices at which fasteners licensed hereunder may be sold by Mount Clemens, and Mount Clemens shall not sell fasteners licensed hereunder at prices lower than those established by Tinnerman. Tinnerman or its other licensees on fasteners licensed hereunder shall not sell fasteners licensed hereunder at prices lower than those fixed by it as minimum selling prices for Mount Clemens."

The Illinois Tool Works agreement, dated August 30, 1946, contains the following provision:

> "7. As long as Tinnerman shall continue to manufacture and sell fastening devices covered * * *

by one or more unexpired patents * * * Illinois will refrain from selling devices covered by the same one or more unexpired patents at prices less than, or on terms and conditions more favorable to the purchaser than, prices computed in accordance with the standards and differentials used by Tinnerman and the terms and conditions used by Tinnerman, in selling fastening devices covered * * * by the same one or more unexpired patents * * *"

It is clear that both these provisions provide for the fixing of the prices at which the licensees may sell the licensed fasteners.

The principle under which defendant contends that multiple price-fixing license agreements by a patentee constitute legal misuse is set forth in Newburgh Moire Co. v. Supreme Moire Co., 3 Cir., 1956, 237 F.2d 283 at pages 293, 294:

> " * * * We think that the patent laws were not intended to empower a patentee to grant a plurality of licenses, each containing provisions fixing the price at which the licensee might sell the product or process to the company, and that, if a plurality of licenses are granted, such provisions therein are prohibited by the antitrust laws."

While the word plurality has several different meanings and while this legal question is a very close one (105 U. of Pa.L.R. 411, 67 Yale L.J. 700, 20 U. of Pittsburgh L.R. 54), it seems to me that in the Third Circuit at least, if a patentee grants more than one license containing price-fixing provisions, such licenses constitute a violation of the antitrust laws and a misuse of the patent which renders the patent unenforceable by the patentee. There is much that could be said for and against the principle quoted above, but in view of the Third Circuit's clear position on the question it would serve no purpose for this court to

---

22. United States Gypsum Co. v. National Gypsum Co., supra, Metals Disintegrating Co. v. Reynolds Metals Co., 3 Cir., 1956, 228 F.2d 885.

discuss the problem. Patent No. 2,233,-230 is unenforceable because of misuse by price-fixing.

Order.

And Now, To Wit: June 27, 1960, judgment will be entered in favor of defendant and against plaintiff. The findings of fact and conclusions of law stated in the foregoing opinion constitute the court's findings of fact and conclusions of law.