PUERTO RICO LABOR RELATIONS BOARD, Petitioner, *v.* CARIBBEAN CONTAINER CO., Respondent.

No. JRT-63-10.          Decided December 24, 1963.

*J. B. Fernández Badillo, Solicitor General, José Orlando Grau, and Celia J. Canales de González* for petitioner. *Celestino*

*Morales, Jr.,* ·and *Francisco L. Acevedo Nogueras* for respondent.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On May 2, 1963 the Labor Relations Board of Puerto Rico, after adopting the findings of fact and conclusions of law of the trial examiner, Miguel Velázquez Rivera, and adopting the recommendations of said officer, rendered a decision and order holding that appellee, Caribbean Container Co., had incurred an unfair labor practice within the meaning of § 8(1)(f) of the Labor Relations Act, 29 L.P.R.A. § 69 (1) (f)[1] and consequently required it, insofar as pertinent,

"1—To cease and desist from:

(a) Violating, in any manner whatsoever, the terms of the collective bargaining contract, or agreement to accept an arbitration award, which it may have signed or may sign with the Union of Employees of Pasteboard Containers Industry (Independent) or with any other labor organization of its employees."

"2—To take the following affirmative action which we consider as accomplishing the purposes of the Act.

(a) To give its consent to the Grievance Committee, together with the fifth member designated by the Secretary of Labor, as provided by subd. 4 of § XIII of the collective bargaining agreement, to decide whether or not the controversy between the parties, in relation to the employment of former workers is arbitrable; and in case the previous question of arbitrability is decided affirmatively, to agree to have the Grievance Committee consti-

---

[1] "It shall be an unfair labor practice· for an·. employer . . .

"(f) To violate the terms of a collective bargaining contract, including an agreement to accept an arbitration award whether or not the same is included in a collective bargaining agreement . . . ."

tuted as aforesaid, decide the merits of the controversy."[2]

In opposition to the Board's request for the enforcement of the order copied above, appellee attacks, in general terms, the findings of fact on which the order was based because they constitute a "biased statement," they are erroneous and are not supported by the evidence. It also alleges that it failed to consider the evidence produced by appellee. Specifically it assigns the commission of several errors which we shall timely discuss.

It is absolutely necessary that we refer briefly to the facts which have given rise to the controversy. From the report of the trial examiner who presided at the hearing we copy the following recital partially:[3]

"The Union of Employees of Pasteboard Containers Industry had been for a long time the exclusive representative of respondent's employees included in the appropriate unit of the collective bargaining. In March, 1962 the Union and the respondent corporation were engaged in negotiations leading to the execution of a new labor collective bargaining agreement to regulate the labor-management relationships of the enterprise for the coming years. On March 13, 1962 without having notified the Mediation and Conciliation Bureau of the Government of the United States, the Union called its members to a stoppage of work in the enterprise. Thus, it happened. The workers, members of the Union, not only quit their regular work for the company but also engaged in agreed activities of protest which included setting up pickets in front of the main entrance of the place where the factory, property of the corporation, is located.

---

[2] The trial examiner had recommended the following: "To accept that the Grievance Committee discuss and adjudge whether or not appellee violated the collective bargaining agreement in refusing to discharge employees who had not worked for the enterprise before March 13, 1962 and refusing to employ former workers of the enterprise."

[3] We have not copied those findings which in our judgment are not supported by the evidence, although some of them constitute permissible inference in the light of the general consideration of all the circumstances revealed by the evidence.

"The employer, on its part, complained of the actions of the labor organization to the officials of the National Labor Relations Board of Puerto Rico. Once the aforesaid federal instrumentality made the preliminary investigation of the case, it was verified that, actually, the Union had not complied with the requirement contained in the Labor Management Relations Act of 1947 to the effect that the Mediation and Conciliation Bureau of the Federal Department of Labor must be notified prior to the time when a labor organization orders a strike in this kind of case. Consequently, the officials of the National Board requested the Union to put an end to the strike . . . ."

The evidence shows that the Union withdrew the pickets which it had posted in front of respondent's factory, but the workers did not go back to their work.[4] In view of said situation,

". . . the company published advertisements in the local newspapers offering jobs to workers who were interested. So, they selected a group of sixty (60) new employees, who rendered services to the enterprise during part of the strike period. But, when the acts of violence recurred the company notified all said new employees that, in view of the risk of being physically attacked, they must not go to work, but they should keep in constant communication with the enterprise by telephone[5] . . . .

---

[4] The trial examiner decided that "The Union accepted the requirement of the National Board and the work of the company was *resumed*." This finding is not supported by the evidence admitted, which shows that after March 13 the work was performed by administrative and supervision employees and by other workers who were not members of the Union and who were recruited by the enterprise.

In relation to the workers' return to work there is a marked conflict because while the enterprise maintains that they continued the strike under the pretext of holding a "standing assembly," and no attention was paid to the written requests to return to work, the Union alleges that the company did not permit entrance to the factory until the contract was signed. This conflict was not settled by the trial examiner, but it is not an indispensable fact to solve the controversy.

[5] The trial examiner added that the purpose of the telephone communication was "to guarantee them the permanency of employment when normality was achieved in the corporation's operations." Said statement is not supported by the evidence, although it is a reasonable inference from the facts.

A total of eighteen (18) of said new employees followed the enterprise's specific instructions on this matter.

"On April 27, 1962 the parties came to an agreement. Consequently, they proceeded to execute a labor collective bargaining agreement which would continue in effect until April 26, 1965.[6] The crucial point in the negotiations, which finally culminated in the execution of the collective bargaining agreement, was the petition of the Union that the company re-employ all the former workers who had gone on strike, discharging, if necessary, the new workers employed during the stoppage of work. The company all the time refused to grant this request. On the contrary, it maintained the thesis that the workers who had gone on strike had lost their status as employees, for which reason the new employees were entitled to keep their jobs.

"The workers were supposed to resume their work on April 30, 1962, but that was not the case. A new controversy arose as to the manner of reinstating the former employees of the enterprise. Finally, by the middle of May 1962, they reached an agreement to return to work on the basis of the peculiar circumstances of said corporation. At the time the original strike was decreed the Company was employing a total of one hundred thirty-five (135) workers. As the respondent enterprise works on a basis of producing the articles per orders received, at the termination of the strike it was not in a condition to resume its operations using again all the one hundred and thirty-five (135) employees. For said reason, the parties agreed that the company would start its operations with a limited

---

[6] In addition to the collective bargaining agreement an "employment agreement" was executed which reads as follows:

"1.—The Union, acknowledged by the Company, shall execute the supplementary agreement attached.

"2.—The Company shall employ former workers as follows:

"All said persons shall be put on a list.

"No other person shall be employed until all those in the list, who qualify, have been offered a job.

"Persons that now or hereafter are convicted of criminal behavior in connection with the strike will be eliminated from the list.

"The order of employment, the number of persons to be employed, the time of employment, and the determination of qualifications shall be the absolute privilege of the Company.

"3.—The Union . is hereby recognized as representative to contract collectively."

number of workers establishing rotating shifts based on a preference list, so that all the former employees have the opportunity to receive income until the manufacturing operations were normal. A waiting list of former employees would be established from which they would be called to work as the need arose. The workers returned to their usual work but the company kept on their jobs and called to work in the first shift the eighteen (18) employees who had not gone on strike and who had started to render service in the period between March 13 and April 27, 1962.[7]

"On May 28, 1962 the Union addressed the respondent Corporation in writing and complained that the Company had violated the agreements which had put an end to the strike. The complaint of the Union was grounded on the contention that the Company was employing a group of new workers while some of the former employees continued without an opportunity of employment.[8] Said letter was clarified by another of June 15, 1962,[9] in which the Union insisted that the violation of the covenant charged against respondent was that the latter was employing temporary workers in the factory, in spite of the

---

[7] It seems fitting to add that at this stage of the controversy the Union sought to have the 18 "new" employees participate in the shift system, which the enterprise denied. The respondent's position is that it was agreed that said 18 employees shall work without interruption, and that the shift system shall only be applied to the "former" employees.

[8] "Before we proceed within the terms of the Act we wish to indicate that said company has been violating the agreements executed with this Union and which put an end to the strike. The collective bargaining agreement in force and its stipulation specifically state that the former workers of the Company are the ones to be included in the list to be called to work.

"The aforecited violation consists in that said Company has employed a large number of workers to perform the same work done by the former employees discharged, while there is a considerable number of former workers without a job.

"By virtue of the foregoing we request the reinstatement of all former discharged workers in their jobs within a term of 72 hours starting from the date of this letter."

[9] "Elaborating on my letter of May 28, 1962 to R. A. Pacheco we wish to state that the violation of the collective bargaining agreement which we claim consists in having permanent worker members of the Union unemployed while the Company is employing temporary workers in the factory."

fact that there were permanent workers, members of the Union, which were not being offered an opportunity to work.

"On June 15, 1962 representatives of the Union and the employer held a meeting to try to decide the controversy. Upon failing to reach an agreement both parties drafted and signed a letter addressed to the Secretary of Labor of Puerto Rico requesting him to designate a fifth member to entertain in the controversy.[10] Since May 31, 1962 the respondent had notified the Union in writing that its position was that it had not violated the collective bargaining agreement. In the very letter, nevertheless, respondent had suggested to the Union that the most appropriate procedure would be to follow the channels provided by the agreement to solve the controversy.[11]

"The arbitrator designated by the Secretary of Labor, on request of the parties, met with them, but he could not assume jurisdiction over the controversy because the employer and the Union did not come to an agreement as to the manner in which the submission would be drafted. While the Union maintained that the crucial point in the controversy was to determine whether the Company had violated the collective bargaining agreement in employing new workers, to the prejudice of former workers, respondent alleged that the question to be submitted to the arbitrator was the determination of whether or not the Company had employed less workers after the execution of the collective bargaining agreement. Lastly, the enterprise assumed the position that the request of the Union was not arbitrable under the agreement and withdrew from the proceedings. The enterprise never proposed or suggested to the fifth member to determine, as a previous jurisdictional question, whether or not the controversy set up by the Union was arbitrable."[12]

---

[10] "We respectfully request you to designate a fifth member to hear the above-entitled case, pursuant to the provisions of the collective bargaining agreement executed between this Company and the Union of Employees of Pasteboard Containers Industry."

[11] "We wish to notify you that this Company understands that it has not violated and is not violating the present collective bargaining agreement and supplementary agreements entered into with said Union on April 27, 1962. That to solve any misunderstanding or controversy that may arise between the parties, the most proper procedure would be to follow the channels provided by the agreement for said purpose."

[12] We add, the Union did not suggest it either.

1—Starting from the basic premise underlying all of its actions throughout the controversy—the employees who participate in an action illegally planned, and refuse to return to work when requested to do so, forfeit their position as permanent employees, and, consequently, the enterprise is at liberty to employ the persons it deems convenient—it is alleged that the Commonwealth Board erred in rendering the order which is challenged, because this was not a controversy between a member of the Union or employee of the Company and the latter. Elaborating on the assignment it is argued that the complaint refers to persons who have not been employed subsequent to the illegal strike, and that, hence, have not acquired the status of employees.

■ Although it is true that the jurisdictional clause of the contract in relation to the procedure to mediate and adjust the grievances refers to a controversy "between the Union and the Company or any of its officials or representatives which alleges the violation by the company concerning the interpretation and/or compliance with said agreement or any of its clauses," respondent's anticipated reasoning is specious because the scope of the order is precisely to establish, as first providence, whether the controversy is arbitrable. It is incumbent on the arbitrator to determine whether actually the matter is covered by the agreement or the annexed covenant. As to this particular the position of the enterprise is that the controversy is not arbitrable because, in the Personnel Manager's own words, "it directly affected a group of employees who were not permanent employees of the company . . . that the article on arbitration deals with permanent employees of the company who are members of the Union" (Tr. Ev. 60–61) while the Union maintains the opposite undoubtedly on the basis that the employment agreement which was executed coetaneously with the bargaining agreement had the effect of wiping out,

if it were necessary, any allegation which might be formulated about the employees' status by reason of their participation in the strike, because the company bound itself to employ the "former" workers and expressly agreed that "[*n*]*o other person shall be employed* until all those that qualify who are in the list, have been offered employment." This is not, as it is sought to convey, a controversy with individual employees, but of the interpretation and scope of the rules of labor—selection of personnel—pursuant to the agreements which regulate the relations of the parties.[13]

■ 2—Nor is respondent correct in stating that the order of the Board is based on the fact that the company was bound to accept the submission proposed by the Union. From the preceding statement of facts it is inferred that between the labor organization and the company there arose a difference as to the workers' employment rules, and that in view of the failure to reach an agreement, *both parties* requested the designation of a fifth member to take cognizance in the allegation of violation of the agreement maintained by the Union thus following the suggestion of the employer's representative, that "the most appropriate procedure would be to follow the channels provided by the agreement for said purpose."

---

[13] Section 8(d) of the Federal Labor Management Relations Act expressly provides that "Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9 and 10 of this Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer."

The waiting period of sixty days to which this article refers starts at the time the desire to terminate or modify the existing collective bargaining agreement is notified. The purpose is to relieve the parties from the economic pressure caused by a strike or stoppage during the negotiation period. *Mastro Plastics Corp.* v. *Labor Board,* 350 U.S. 270 (1955). See also, *United Elec. R. & M. Wkrs.* v. *National Labor Rel. Bd.,* 223 F.2d 338 (C.A.D.C. 1955); *Boeing Airplane Co.* v. *National Labor Relations Bd.,* 174 F.2d 988 (C.A.D.C. 1949).

It cannot escape even the most naive that the position of the parties is clear and that both are aware of what each maintains and seeks. Now then, as the Company insists that the controversy is not arbitrable on the ground of lack of permanence of the employees represented by the Union and affected by the preferential employment of 18 workers who did not participate in the strike and who were recruited by the company during the stoppage, the Board wisely amended the report of the trial examiner and ordered that this was the first question to be solved by the arbitrator. Note, *Arbitration: Scope of the Arbitrable Dispute: Dispute Arbitrable Even Though Prima Facie Without Merit*, 9 U.C.L.A. L. Rev. 218 (1962). To hold an opposite view would be to grant an absolute veto power to any of the parties which could, by simply adopting the position that a dispute is not arbitrable, thwart the purpose of said mechanism intended to settle the differences which may arise by means of a speedy and simple procedure. On the nature of industrial arbitration and the cases in which it is typically applied, we recommend the reading of the article *"Reflections on the Nature of Labor Arbitration"* by Professor R. W. Fleming, of the University of Illinois, 61 Mich. L. Rev. 1245 (1963), to be compared with *Pérez* v. *Water Resources Authority*, 87 P.R.R. 110 (1963).

3—It is alleged that the evidence offered does not support the decisions of the Board. We have examined the record of the proceedings and, with the exception of the points we have stated in the statement of facts—which do not substantially affect the validity of the Board's actions —we find there is sufficient basis for the conclusions stated. There is no doubt that all the circumstances show that the company, after it suggested itself to resort to arbitration, has refused to participate effectively as required by the agreement, and if this were not enough, by the agreement

of June 15 requesting the designation of a fifth member. The other contentions require no discussion.

■ Even if the question has not been expressly raised, we think that the order of the Board to cease and desist is too ample pursuant to the standards outlined in *Labor Relations Board* v. *Ceide, ante,* p. 659. There is nothing to justify it being extended beyond the violations of the contract and the agreements in force.

The order of the Labor Relations Board will be modified pursuant to the terms of this opinion and as modified it will be affirmed.